UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ANDREW JEFFRIES,

Petitioner,

v.

KEN CLARK,

Respondent.

No.  2:20-cv-02414-DAD-KJN P

FINDINGS AND RECOMMENDATIONS

I.  Introduction

Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his September 2013 conviction for first degree murder with the special circumstance of means by lying in wait, possession of a firearm by a felon, willful infliction of corporal injury, possession of a controlled substance, and falsifying a document.  Petitioner was sentenced to life without the possibility of parole plus a consecutive determinate term of seven years in state prison.  Petitioner now raises the following claims:  (1) prejudicial error occurred when the trial court failed to instruct on the natural and probable cause doctrine with felony assault and simple assault as target crimes; (2) improper admission of prior domestic violence evidence; (3) improper admission of uncharged offenses as propensity evidence; (4) improper jury instruction regarding lying in wait special circumstance; (5) erroneous jury instruction of uncharged conspiracy theory of liability is not a

1

1   valid theory of accomplice liability; (6) ineffective assistance of counsel due to cumulative errors;

2   (7) newly discovered evidence.  After careful review of the record, this Court concludes that the

3   petition should be denied.

4   II.  Procedural History

5         In September 2013, a jury found petitioner guilty of first degree murder of Anthony

6   Ortega, finding as true the special circumstance allegation of lying in wait, possession of firearm

7   by a felon, corporal injury upon Amy Quillen, possession of a controlled substance, and falsifying

8   a document.  (ECF No. 34-1 at 143-48.)  On October 11, 2013, petitioner was sentenced to life

9   without the possibility of parole plus a determinate term of seven years in state prison.  (Id. at

10  171-74.)

11        Petitioner appealed the conviction to the California Court of Appeal, Third Appellate

12  District.  The Court of Appeal affirmed the conviction on August 28, 2019.  (ECF No. 34-26.)  He

13  filed a petition for review in the California Supreme Court, which was denied on December 31,

14  2019.  (ECF Nos. 34-27 & 34-30.)  Petitioner filed several state habeas petitions, which the state

15  courts denied.  (ECF Nos. 34-31 to 34-34.)  Petitioner also appealed an order denying his petition

16  for resentencing under Penal Code section 1170.95 by the Sacramento County Superior Court,

17  which the state appellate court dismissed.  (ECF Nos. 34-35 to 34-39.)  The California Supreme

18  Court granted the petition for review and deferred action pending further order of the court.  (ECF

19  No. 34-40.)

20        Petitioner filed a federal habeas petition in November 2020.  (ECF No. 1.)  Respondent

21  filed a motion to dismiss for failure to exhaust claims six and seven, and petitioner filed a motion

22  to stay.  (ECF Nos. 12-14.)  This Court partially granted the motion to dismiss as to claims six

23  and seven and granted the motion to stay the petition.  (ECF Nos. 17 & 19.)  After exhausting

24  claims six and seven, petitioner moved to lift the stay, which this Court granted.  (ECF Nos. 21-

25  22.)  Petitioner filed a first amended petition on October 1, 2021.  (ECF No. 23.)  Respondent

26  filed an answer, and petitioner filed a traverse.  (ECF Nos. 34–36.)

27  ////

28  ////

III.  Facts[1]

         After independently reviewing the record, this Court finds the appellate court's summary
accurate and adopts it herein.  In its unpublished memorandum and opinion affirming petitioner's
judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District
provided the following factual summary:

> According to the prosecution's theory of this case, in the rainy, early
> morning hours of March 28, 2012, defendant Andrew Jeffries and
> defendant Robert Haven lured their acquaintance, Tony Ortega, to a
> secluded location under the pretense that they were going to steal a
> car together. However, shortly after 1:00 a.m., on a rural road in
> Elverta, Jeffries and/or Haven shot Ortega in the back and head,
> killing him. Trial evidence and testimony also implicated Jeffries's
> wife, defendant Wendy Fong-Jeffries,[1] in the plot to kill Ortega.
>
> [N.1 While it appears that defendant Wendy Fong-Jeffries now may
> prefer to go by the name Wendy Jeffries, for clarity, we refer to her
> as "Fong-Jeffries," while referring to defendant Andrew Jeffries as
> "Jeffries."]
>
> The jury found Jeffries guilty of murder in the first degree (Pen.
> Code, § 187, subd. (a)),[2] and found true the special circumstance that
> he intentionally killed Ortega by means of lying in wait (§ 190.2,
> subd. (a)(15)). The jury further found Jeffries guilty of possession of
> a firearm by a felon (§ 29800, subd. (a)(1)), willful infliction of
> corporal injury on Amy Quillen (§ 273.5, subd. (a)), possession of a
> controlled substance (Health & Saf. Code, § 11377, subd. (a)), and
> falsifying a document (§ 134). Jefferies was sentenced to life without
> the possibility of parole plus a consecutive determinate term of seven
> years.
>
> [N.2 Further undesignated statutory references are to the Penal Code
> in effect at the time of the charged offenses.]
>
> The jury found Haven guilty of murder in the first degree (§ 187,
> subd. (a)) and found true the special circumstance that he
> intentionally killed Ortega by means of lying in wait (§ 190.2, subd.
> (a)(15)). The jury further found Haven guilty of possession of a
> firearm by a felon (two counts) (§ 29800, subd. (a)(1)), possession of
> a controlled substance (Health & Saf. Code, § 11377, subd. (a)), and
> falsifying a document (§ 134). Haven was sentenced to life without
> the possibility of parole plus a consecutive determinate term of four
> years.
>
> The jury found Fong-Jeffries guilty of murder in the first degree (§
> 187, subd. (a)) and found true the special circumstance that she
> intentionally killed Ortega by means of lying in wait (§ 190.2, subd.

---

[1]  The facts are taken from <u>People v. Haven</u>, C074940, 2019 WL 4051881, at *1-16 (Cal. Ct.
App. Aug. 28, 2019), a copy of which respondent lodged as ECF No. 34-26.

(a)(15)). The jury further found Fong-Jeffries guilty of falsifying a document (§ 134). Fong-Jefferies was sentenced to life without the possibility of parole plus a consecutive determinate term of two years.

On appeal, Fong-Jeffries asserts that: (1) the evidence was legally insufficient to support the lying-in-wait special circumstance insofar as alleged against her; (2) the trial court's instruction on lying in wait allowed the jury to find that special circumstance to be true against her without proof that she knew or intended the murder to be committed by lying in wait; (3) the trial court erred in instructing the jury that she could be guilty under an uncharged conspiracy theory of liability; (4) her conviction of murder must be reversed because the prosecution presented insufficient corroboration of incriminating accomplice testimony; (5) the trial court's instructions to the jury on accomplice testimony undermined her credibility and thus, deprived her of her right to testify and present a complete defense; and (6) the cumulative effect of these errors deprived her of a fair trial. We reject Fong-Jeffries's claims.

Haven contends: (1) that the trial court erred in denying his motion pursuant to section 1538.5 to suppress the fruits of law enforcement's warrantless search of the apartment in which he was arrested based on their erroneous belief that a probationer with a search condition resided in the apartment, and, (2) joining in Fong-Jeffries's argument, that the trial court erred in instructing the jury on an uncharged conspiracy theory of liability. We conclude that, even if law enforcement violated Haven's Fourth Amendment rights in conducting the probation search which led to Haven's arrest and subsequently the discovery of certain evidence, under the circumstances of this case, law enforcement cannot be deemed to have engaged in deliberate, reckless, or even grossly negligent conduct, triggering application of the exclusionary rule. We also conclude, as we do with regard to Fong-Jeffries's claim, that the contention regarding the uncharged conspiracy theory of liability is without merit.

Jeffries asserts: (1) that the California Supreme Court, in effect, created a new, lesser included offense of second degree murder based on aiding and abetting a lesser crime, and that the trial court erred in failing to instruct the jury on the natural and probable consequences doctrine consistent with this theory of liability; (2) that the trial court abused its discretion in admitting evidence of a prior incident of domestic violence, and that the admission of this evidence deprived him of a fair trial; (3) that the admission of evidence of uncharged acts as propensity evidence under Evidence Code section 1109 violates the due process and equal protection guarantees of the Fourteenth Amendment; and, (4) joining in Fong-Jeffries's argument, that the trial court's instruction on lying in wait allowed the jury to find that special circumstance to be true as to him without proof that he knew or intended the murder to be committed by lying in wait and that the trial court erred in instructing the jury that he could be guilty under an uncharged conspiracy theory of liability. We conclude that Jeffries's claims are without merit.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The People's Case

Amy Quillen and Jeffries had two children together. Quillen testified that, shortly after her oldest child was born, she and Jeffries began selling methamphetamine.[3] A supplier named Bianca would drop off one to two ounces of methamphetamine every week or two.

[N.3 Quillen testified under a grant of immunity.]

According to Quillen, her relationship with Jeffries "had its ups and downs," and there were times when he was abusive. In 2007, Jeffries beat Quillen, punched her legs and back, head-butted her, and dragged her by her hair. Quillen sustained bruises on her leg and back. Jeffries also threatened Quillen with a gun. Quillen contacted the police, and officers arrested Jeffries. Police officers photographed Quillen's injuries, and the photographs were admitted at trial. Quillen and Jeffries separated and reconciled several times. Eventually, they moved into an apartment at 2687 Altos Avenue, where they continued to sell methamphetamine.

In 2011, Jeffries informed Quillen that he had discovered that he and Fong-Jeffries had a daughter together. Quillen suspected that Jeffries and Fong-Jeffries were renewing their relationship. Quillen left Jeffries, and a custody battle ensued. Quillen again reconciled and moved back in with Jeffries.

At some point after Quillen moved back in, she observed that there were guns in the apartment. She recalled seeing a silver .357-caliber handgun with a wooden handle which had initials carved into it. Quillen also recalled seeing a longer black gun with a banana clip in the apartment.

At some point, various people began living with Jeffries and Quillen. First, Theresa Wilkey and Tony Ortega, methamphetamine users Quillen met through Jeffries, moved into the apartment. Jeffries and Quillen supplied Ortega and Wilkey with methamphetamine. Later, Thad Curtis and Granvil Smith lived in the apartment.

By the end of 2011, Quillen's relationship with Jeffries was "terrible." Beginning on or about January 4, 2012,[4] Quillen secretly developed a closer relationship with Ortega. They became intimate.

[N.4 Unless otherwise noted, all dates are in the year 2012.]

Sometime between January and February, Quillen learned that Jeffries was aware of her relationship with Ortega. Jeffries called Quillen and said, "you're dead, bitch," and then hung up. Later, Jeffries came home, burst through the door, and immediately started hitting Quillen, who was sitting on the couch with her youngest son on her lap. Wilkey took the boy to another room while Jeffries continued to strike Quillen. Jeffries stood Quillen up and told her that

5

they were going to talk to Ortega. Jeffries drove Quillen to a field, and, during the drive, he told her that, if it was true, he was going to shoot her "execution style." He told her that he had a gun underneath the car seat.

When they arrived and got out of the vehicle, Ortega was standing in the middle of the field. Ortega yelled, "[I]t's true, it's true, I'm not lying, I'm not lying." Jeffries turned around, walked to the truck, and began to drive away. Quillen told Ortega to tell Jeffries that he was "whacked out or something ..." because Jeffries was going to kill them. Ortega flagged Jeffries down as he was driving away and told Jeffries that he did not know what he was thinking. Jeffries responded by saying, "[T]hat's all you have to say," or something similar. Ortega and Quillen got back in the vehicle, and they all went home. Quillen, however, suspected that Jeffries did not believe them.

On the night of February 28, Quillen awoke to Jeffries punching her in the head. He was saying that he hated her, and that he had reviewed the contents of her phone. He had found a text message from Quillen to Ortega, in which she said that she "needed to feel his touch." Jeffries called Quillen a lying bitch, and said, "he knew it was true." He continued to strike her on the head, side, and leg. The assault moved from the bedroom into the living room, where Jeffries pushed Quillen over a couch. Jeffries attempted to strike Quillen with a baseball bat, but Curtis grabbed the bat and told Jeffries that he needed to stop or he would go to jail. Jeffries told Smith not to let Quillen leave the apartment, and Jeffries and Curtis went out. When they returned, Quillen heard Jeffries say that they had found Ortega, and that he had said "it was true again." Curtis said to Jeffries, "[Y]ou call the shots. Whatever you want done, it's done." Quillen assumed that they were going to kill her and Ortega. Jeffries told Quillen that, the next morning, he was going to ask their eldest son if he had ever seen Quillen intimate with Ortega, and if he said yes, Jeffries would kill her. After telling Curtis and Smith to keep an eye on Quillen and not let her leave or call anyone, Jeffries went to sleep. Several hours later, Quillen found Jeffries's phone, went into the bathroom, locked the door, turned on the water, and climbed out a window. She went to a neighbor's apartment and called the police.

On February 29, Officer Christopher Shippen took a statement from Quillen. Shippen observed an injury to the lower left side of Quillen's face, an abrasion by her mouth, swelling on her cheek, and a small cut inside her mouth.

Officers Chris Baptista and Michael Boyd went to 2687 Altos Avenue, apartment 1. Smith answered the door and allowed police in. Officer Boyd spoke with Jeffries in a back room, and then arrested him. As Jeffries was being escorted from the apartment, he asked for something warmer to wear. Boyd retrieved a sweatshirt from the bedroom door handle. According to Boyd, before giving the sweatshirt to Jeffries, he checked it to make sure it did not contain any contraband or weapons. Police also arrested Smith and Curtis.

As Jeffries was being processed in the booking area of the police station, Boyd discovered that Jeffries had a piece of plastic in his

hand which, to Boyd, appeared to contain a controlled substance. The parties stipulated that narcotics booked into evidence by Boyd on February 29, contained 2.42 grams of methamphetamine.

Fong-Jeffries bailed Jeffries out of jail and immediately moved in with him in the Altos Avenue apartment. However, Jeffries told others in text messages that he wanted to be with Quillen, not Fong-Jeffries, and he blamed Ortega and Wilkey for the troubles in his relationship with Quillen. Jeffries repeatedly sent messages to Quillen, directly and indirectly, seeking to reconcile.

Jeffries began to spend a significant amount of time with defendant Haven, a methamphetamine customer of Jeffries's who knew Fong-Jeffries from childhood. Haven began to assist Jeffries with his methamphetamine-dealing enterprise. Concomitantly, on or around March 18, Jeffries began using and texting from a new mobile number, and Haven began to use Jeffries's old number.[5]

[N.5 At trial, the text messages were discussed as being exchanged between specified telephone numbers rather than individuals. However, the parties do not dispute on appeal the identity of those exchanging the text messages.]

In a text message exchange on March 19, Jeffries asked Haven when he was going to get Ortega, and urged Haven to find him. Subsequently, Haven indicated that he was at Ortega's mother's house, but there was no answer. Jeffries asked Haven if he thought he was "getting played," and Haven responded that he thought Ortega was just "out doing something stupid ..." like "[l]ooking for a car." Jeffries continued to express suspicion that Ortega was going to "fuck [him] over ...," and Haven responded, "All we can do is watch him and see how he acts. And if he even looks like he's going to try to fuck you over, I give you my word I'm going to take him down, any means necessary."[6]

[N.6 There are occasional, very minor, discrepancies between the language actually texted, and that transcribed by the court reporter as witnesses and attorneys read the text messages at trial. These discrepancies have no significance with regard to any issue on appeal.]

On March 21, Jeffries texted to Stephanie Engel, "[M]y family is fucked and I ain't no punk [I] miss my girl and [I] am just furious." As the exchange continued, Engel urged Jeffries to calm down, and stated, "[E]verything needs a plan that you can handle with class. Isn't that what you tried to teach me?" Jeffries responded, "No, it ain't, because Theresa manipulates and lies still, and Tony is up to something." When Engel asked what Jeffries was "doing with him," Jeffries responded, "Class is out the window. And it will be broadcasted what Amy and my family mean to me very soon." He continued, "Just think old Italian mafia style. I love her and now I'm going to show it at the ultimate." Jeffries texted, "[N]ow they fucked with my heart and it's heart check time." He further texted, "[S]he'll never doubt my feelings for her again."

On March 22, Engel asked Jeffries if he ever met up with Ortega, and Jeffries responded that Ortega was "avoiding real weird like ...." He clarified, "He's just up — he's just up and runs off, and it's just weird." Engel responded, "So the problem is he isn't trusting you, right? He did go for that drive in your truck, right," and Jeffries replied, "Yeah, I think so, but I got him. It will happen. Know that."

On March 23, texts from Haven indicated that he was in a truck with Ortega and Dustin Cook. Haven texted Jeffries that they were getting gas and that they would be there in a minute. He then reported: "Dustin said he thinks Tony got something hella heavy on him, might be a gun. Tony dropped it on the floor of the truck." He then clarified, "He's got it on him. He picked it up. It's in his pants." Within an hour of that exchange, Fong-Jeffries texted Haven, "Please be safe, okay?" Later, Haven texted to Keith Davenport: "We were picking up Tony on the way to your place. All the sudden Tony like flipped out, got paranoid and took off walking." He continued, "You ever heard of the saying, keep your friends close, but keep your enemies closer?" Haven subsequently texted to Davenport: "This shit with Tony is about keeping the family protected." Haven then texted Jeffries that Ortega was "nowhere to be found," and, "[l]et me know when to come out. I'll do it right here if need be." Jeffries texted Engel that "the first one's in motion," and that "[i]f all goes well, two to go." After Engel cautioned Jeffries to be careful, he responded, "I need my baby back, so I'm going to show what she means to me. She questioned this one time." Jeffries continued, "And shit like this turns her on. LOL. Yeah, if I'd ever do that for or over her." However, Jeffries subsequently texted Engel, "God damn this mother fucker." Engel asked, "Avoid it?" to which Jeffries responded, "Fuck yes."

On March 24, Jeffries sent a series of text messages to the number of Ortega's mother, Cheryl Cook,[7] apparently trying to contact Ortega. Jeffries texted, "Tony, what's up? Hit me back." "You want to make this money or not, bro?" "Hey, I can't wait all night, bro. I'm going in the next hour, so hit me up." "Hey, I get it, bro, don't trip. You asked me to help you come up. I try to help and you blow me off. Thanks, dawg."

[N.7 We refer to Cheryl Cook and Dustin Cook (no apparent relation) by their first names to avoid confusion.]

On March 25, Jeffries texted Haven, "You ready?" When Haven responded that he was, Jeffries replied, "Have the backpack. Going to test-run." Haven texted, "Dusty can grab it for me out of the truck. The piece is on me."

Later on the same day, Haven texted Cheryl's number, stating, "Hey, Tony, it's Robby. Seeing if you home. I was going to come by and see if you wanted to smoke."

On March 26, Haven texted Jeffries, "Ready whenever you are. And are we taking Dustin?" Jeffries responded, "Your call." Haven replied, "I say take him. I know we can trust him. Text me when you're ready." Later, after texting Cheryl's number stating, "[W]e'll be leaving in a few minutes to pick you up." Haven texted Jeffries,

"What's up? He's gone." Jeffries responded, "Are you fucking serious?" After Haven asked for instructions, Jeffries asked where he went. Haven responded, "That mother fucker knows something is up. I called to check on him. He was tripping, saying something about you can't outshine the shiner." Jeffries then texted to Cheryl's phone: "Tony, what's up, bro? Did I miss something? Have I done something wrong? I'd like to know." Ortega texted back, "Are you really going there, bro? It's not just you, homeboy. It's everyone, dude." Later in the evening, Jeffries again texted Cheryl's number, "Hey, Tony, hit me up. I got a few more jobs ...."

Also on March 26, Haven texted Fong-Jeffries, and asked her, "[C]an you possibly get me a box of what we talked about the other night and bring it home tonight and I'll pay you back when you get here. I just need one box." Fong-Jeffries responded that she could "get them this afternoon," and Haven explained, "It's just with everything going on, I feel more comfortable having more to sit. feel me?" Haven then told Fong-Jeffries that he believed that Curtis was attempting to "turn some of the other brothers against" Jeffries. Haven stated, "I will not let anything happen to [Jeffries], you or the kids." After Fong-Jeffries thanked Haven for "everything you do," Haven responded, "I will eliminate these obstacles in our way. I'm done playing with him and Tony." Fong-Jeffries stated that matters would "be much better for [Jeffries] once this whole situation is resolved." She subsequently stated: "[O]nce Tony's done, Theresa's going to have to be done quick." Haven responded, "Yeah, I know she'll be. I put [Curtis] on the list as well." Fong-Jeffries replied, "Yeah, [Curtis] needs to be on the list." When Fong-Jeffries expressed her concern over the possibility that Jeffries could have to "do ... time," presumably based on the charges involving Quillen, Haven reassured her that he would help, stating, "You guys are my family. You are never a burden. It's my honor to ride side by side with you guys. I love all you guys. I will give my life to protect you guys. I don't have people like you and [Jeffries] in my life, people that I call family. And I just got you back into my life. I thank God every day for that." Fong-Jeffries again reassured Haven she would get a box for him.

Haven again texted Cheryl's number, stating: "Tony, it's Robby. You going to be ready when we call? It will be a little after ten."

The following day, March 27, Haven texted Cheryl's phone, and asked her if Ortega was around, and to have him call Haven. Haven then texted Fong-Jeffries and stated that he needed to use her car that night. Fong-Jeffries expressed reluctance, stating: "I need to know what [Jeffries] says because I'm not going to do anything to piss him off." Haven assured her that Jeffries had been amenable the prior evening when he mentioned it, and stated, "[R]egardless, our Tony problems end tonight." Fong-Jeffries replied, "I want to make sure [Jeffries] is still good with that. If you take my car, please be careful. I can't afford to get another one." Haven then stated, "Me and [Jeffries] think Tony tried to sabotage the truck." He later stated, "[W]hen it comes to Tony, his luck ends tonight. You have my word on that." Fong-Jeffries replied, "Okay. This definitely needs to come to an end. I also want to be careful. I'm seriously mad enough to do

9

something that could get me in trouble." Haven responded, "I got this. But you guys have to let me do it my way. This trying to be his friend and help him shit ain't working." As the exchange concluded, Fong-Jeffries texted Haven: "Erase these messages, please."

Again on March 27, Jeffries texted Haven, "Job tonight." Haven asked who was going, and whether Jeffries was going. When Jeffries responded that Ortega was going, Haven responded, "I know Tony's going. What I'm asking is, are you going or should I take Dustin? He said he'd ride all the way. I trust him." When Jeffries stated that it was Haven's call, Haven responded, "I asked him. He says he's with the bis."

Stephanie Anton testified that, on March 27, between 4:00 and 5:00 p.m., she saw a big, silver revolver on the coffee table of Jeffries's apartment. She also testified that she saw Jeffries with the gun stashed in his waistband at his back when he was either in the living room or exiting the apartment. Thereafter, Anton went to the apartment upstairs to get high. While she was there, she saw Jeffries's vehicle in the parking lot. At trial, she testified that she was not sure who was driving the vehicle, but she testified that, in a police interview in April, she stated that, after Jeffries left the apartment with the gun, she saw his vehicle arrive and saw that Haven was driving.

Cheryl testified that the last time she saw Ortega alive was at her apartment between 8:00 and 9:00 p.m. on March 27. Ortega was with Jeffries and Haven. Ortega and Haven smoked methamphetamine together. Jeffries, Haven, and Ortega then left.

At approximately 11:29 p.m., Haven texted Jeffries, "Next spot [I]'m doin[g] him." Approximately 45 minutes later, Jeffries texted Haven, "Kickin[g] his ass," and Haven later responded, "Beatin[g] the brakes off this lame."

Shortly after 1:00 a.m. on March 28, Jerry Wenger was sleeping in his home on Kasser Road when he awoke to the sound of several loud bangs. After failing to determine what caused the sound, Jerry and his wife Rebecca went back to sleep.

In the early morning hours of March 28, Jenifer Fassett was "ghost hunting" with friends near Kasser Road. When Fassett turned onto Kasser Road, she observed something in the street she believed to be an animal. She quickly realized, however, that it was a person. The individual's face was "scratched up." Fassett started to drive away, but one of her friends convinced her to go back. They drove by the person again, and one of Fassett's friends called 911. Fassett and her friends waited nearby for police to arrive.

Detective Jeffrey Wallace responded to the Kasser Road location at approximately 4:00 a.m. Wallace observed Ortega's body, lying flat on his back on the shoulder of the road, partially in a drainage ditch. Ortega had bullet wounds on his left palm, his left cheek, on the left side of his forehead, in the middle of his chest and back, and on his right forearm. A bottle of pepper spray was clutched in his hand. Near

10

the body, officers found a key chain with two Honda keys that were shaved down, of the type employed by car thieves. A window punch, used to break car windows or other types of glass, was discovered in Ortega's pocket. Wallace did not locate any cartridge cases at the scene.

The pathologist who performed the autopsy on Ortega testified that a bullet entered Ortega's back between his shoulder blades traveled into his chest, broke a couple of ribs and punctured a lung, and exited Ortega's chest at the base of his neck. This was a fatal wound. Ortega also had a gunshot wound on his right forearm. Additionally, a bullet entered the back of Ortega's hand and came out the palm of his hand. The tips of Ortega's middle and ring fingers were injured, suggesting that Ortega's hands were "curled" when he was shot. The physician also theorized, based on the irregular shape of the wound to Ortega's forearm, that the bullet which caused that wound may have struck something else first, perhaps Ortega's right hand. Finally, Ortega had a gunshot wound to the right side of his face over his cheekbone. The bullet passed through Ortega's right eye socket, behind the nose, and exited the left side of his face. One wound could have been a reentry wound, so Ortega was shot either three or four times.

Late in the morning of March 28, Fong-Jeffries texted Haven to wake him up. Fong-Jeffries asked, "Did everything go as planned? I haven't been able to talk to [Jeffries] about anything yet." Haven responded, "You, [Jeffries] and the kids are a little bit safer now. The security system has been tightened up. I told you I'd fix it. Feel me?" Fong-Jeffries replied, "Thank you. It means a lot to me, everything that you do." Haven then asked whether he could ask a "dumb question." Haven texted, "I already know the answer but [I] just need to hear it ok. I can trust [Jeffries] right[?] I mean [you] know to hav[e] my ba[c]k[?] Please don['] t b[e] mad at me for askin[g]." Fong-Jeffries responded, "I'm not mad. Yes, he will always have your back. He loves you. You have been there for him and he'll be there for you. The only way things would change would be if you fucked him over, which we both know would not happen. What's making you stress on that? Did something happen or was something said?" Haven responded that nothing happened. He texted, "[L]ike [I] told him last night [I] would do anything last night. I love [Jeffries]. I just wanted to hear it [you] feel me." Haven subsequently texted, "Hey [you] know [Jeffries] was on the phone last night. He was talkin[g] [a]bout me & he called me his ace duce [*sic*] & his kid. It made me feel so good." He then texted, "I love you, Wendy. I would do anything for you guys." When Fong-Jeffries texted that she hoped Haven realized that the loyalty "goes both ways," Haven responded, "I do know that. Otherwise, I wouldn't have done what I did. You know, I'm [Jeffries's] kid, remember?" Haven then texted Fong-Jeffries that he needed another "toy." Fong-Jeffries replied that she had to take a test before she could buy anything, and that they would have to "see what you want and price it out." Haven responded that he could "take one off the street, it don't matter." Fong-Jeffries responded, "we're going to have to find one. You talk to [Jeffries] about it?"

Bianca Villanueva testified that she used to sell large quantities of

methamphetamine to Jeffries.[8] Occasionally, Villanueva would conduct these transactions with Haven if Jeffries was unavailable. Towards the end of their business relationship, Jeffries occasionally paid Villanueva with items other than cash. Jeffries had paid Villanueva with two guns, a computer, and ammunition. Villanueva testified that, at one point, Jeffries had told her that he had a particular gun for her as well as a sum of money. On the morning of March 28, when Villanueva woke up, she discovered that she had multiple missed calls from both Jeffries and Haven, who had been calling her "all night." Eventually, Haven called her again and stated that Jeffries wanted her to come to his apartment. She then got a ride from a friend and went to the apartment to pick up the gun. Jeffries gave Villanueva a .357-caliber handgun. Both Jeffries and Haven seemed to take care not to touch the gun with their bare fingers; it was wrapped in a shirt. Villanueva placed that gun in a safe in her storage unit, where she also stored a box of 50 rounds of ammunition that Jeffries gave her.

[N.8 Villanueva testified under a grant of immunity.]

Dustin Cook was a methamphetamine user who obtained drugs from Jeffries or Haven.[9] Dustin performed errands for Jeffries and Haven in exchange for methamphetamine, including delivering drugs and collecting money. Dustin testified that, one day while he was in one of the apartments at Altos Avenue, Haven stated that he needed to speak with him in the bathroom. Haven then told Dustin that the "issue with Tony is done." Dustin asked what Haven meant, and Haven responded, "Tony, I took care of him." Dustin continued to express confusion, and Haven then told Dustin that he shot Ortega. As he was speaking, Haven pulled a handgun from his waistband and set it on his lap. Haven told Dustin that he and Ortega got out of a car, and Haven walked up behind Ortega and shot him three times in his back. Jeffries had remained in the car. After Haven told Dustin about the shooting, Haven, with the gun still on his lap, asked Dustin, "You ain't going to turn on me, are you?" Dustin told the jury that, after Jeffries was arrested, Fong-Jeffries asked him to testify that Jeffries was at home at the relevant time. She also asked him to testify that Jeffries had gone with her to Yuba City.

[N.9 Dustin Cook also testified under a grant of immunity.]

On April 11, Fong-Jeffries texted Jeffries, "I typed up the letter. How many copies do you think I should make? I got the address for the District Attorney's office." She subsequently texted Jeffries, "Dustin is coming down with the signatures for you. I'm telling you, Dustin got it down." Quillen testified that she neither wrote nor signed a letter which was sent to the district attorney's office, People's Exhibit number 12, in which someone purporting to be Quillen requested that the domestic violence charges against Jeffries be dropped.

On April 13, Officer Robert Young participated in a search of apartment 2 at 2687 Altos Avenue. Young detained Haven in the kitchen. Young asked Haven if he had any weapons, and Haven responded, "It's on my hip." Young searched Haven and found a loaded nine-millimeter handgun as well as a small amount of

methamphetamine on Haven's person. Upon running the serial number for the gun, Young learned that it was registered to a Buck L. Fong in Woodland. The parties stipulated that the narcotics booked into evidence by Young on April 13, contained .65 grams of methamphetamine.

On April 14, Detective Tom McCue searched Villanueva's storage unit. Among other items, McCue found a safe which contained approximately one ounce of methamphetamine, a .357-caliber Taurus handgun, and a box of .357-caliber bullets with four rounds missing. Forensic analysis revealed that a bullet jacket recovered during Ortega's autopsy matched bullets test fired from the gun.

Detectives picked up Villanueva three days later. After she learned that her storage unit had been searched, Villanueva contacted Jeffries. She informed him that police seized the guns and drugs in her storage unit. Jeffries told her to tell police that she acquired the guns from some "pisos," or Mexicans.

**Defendant Jeffries's Case**

Shayleen Leary, Jeffries and Fong-Jeffries's 18-year-old daughter, testified that, on March 27, she was at the apartment on Altos Avenue, and she was sick. Jeffries went out to do some errands, and he arrived home at 11:30 p.m. Leary saw Jeffries come home, and he did not go out again. Leary was on the living room couch, and anyone leaving the apartment would have had to pass her to exit. Jeffries was still at the apartment when Leary awoke in the morning. Leary never saw Jeffries with a gun.

Desiree Dynes, Jeffries's best friend and a friend of Haven, testified that, on the night of March 27, she was having problems with her former husband. At approximately midnight, she went to the apartments on Altos Avenue, where she saw Jeffries in his apartment. Dynes then hung out with the people who lived in the apartment upstairs until approximately 6:00 a.m. During that time, she sat on the exterior stairs. According to Dynes, Jeffries was home during this entire time.

Vic Arneson lived in one of the apartments on Altos Avenue. Arneson testified that Haven told him, "he handled Tony." Haven stated that "no one fucks with my family." Jeffries's name never came up.

Theodore McQueen testified that Haven began staying with him in his apartment on Altos Avenue a little before March.[10] One night, at approximately 3:00 or 3:30 a.m., Haven asked McQueen to "get rid of some stuff for him ....." McQueen placed clothing Haven gave him in a bag, rode his bike down to the river, poured lighter fluid on the bag, and set it on fire. McQueen also testified that Haven asked how to remove gunshot residue from one's hands. McQueen told him how to remove gunshot residue, and had his girlfriend get the materials required. McQueen testified that he had seen Haven with a gun on two or three separate occasions. He saw Haven with a black semi-automatic pistol on the day that Haven was arrested for possession

13

of methamphetamine. Approximately one to two weeks earlier, he had seen Haven with a revolver.

[N.10 McQueen testified under a grant of immunity.]

Granvil Smith testified that, on February 29, he was in Jeffries's apartment on Altos Avenue when he was arrested. Smith had seen Ortega at that apartment on the evening of February 28. Ortega took bundles of methamphetamine out of his black windbreaker, gave Smith two, and placed one back in his pocket. The next day, police arrived at the apartment and woke Jeffries. Jeffries came out of his bedroom with no shirt on, and he asked the arresting officers if he could get a shirt. One of the officers grabbed Ortega's black windbreaker off of the couch, threw it over Jeffries's shoulder, and placed Jeffries in the police car. Smith testified that Jeffries was not present when Ortega shared his methamphetamine with Smith, and Jeffries would have no reason to know that there were drugs in the windbreaker.

**Defendant Fong-Jeffries's Case**

Fong-Jeffries testified about the various text messages. She testified that, when Haven asked her in a text message for "a box of what we talked about the other night," he was referring to ammunition. On cross-examination, Fong-Jeffries testified that, when Haven asked for ammunition, she did not know that he intended to use the .357-caliber handgun to shoot Ortega. Haven had not told her what the ammunition was for, only that he "had problems with people and he was concerned with his well-being." She testified on cross-examination that Curtis had threatened Haven's life.

Fong-Jeffries testified that, when, in text messages, she stated that matters would be better for Jeffries when "this whole situation is resolved," she was referring to people, including Ortega and Curtis, using Jeffries for money and drugs. She further testified that, when she texted that, once Ortega is done, "Teresa is going to have to be done quick," she was referring to cutting them off. Further, when Haven texted Fong-Jeffries that their "Tony problems end tonight ....," she believed that Haven intended to "confront [Ortega] and basically kick his ass and tell him to stay away." Thereafter, she thought Ortega would no longer "com[e] around and mooch[ ] off of [Jeffries]." Additionally, when Haven texted her, "That dope fiend piece of shit. When it comes to Tony, his luck ends tonight. You have my word on that," she believed Haven was indicating that he was cutting Ortega off and that he would no longer be lucky enough to get things from Jeffries. She testified that when she texted Haven to ask him "if everything went as planned last night," she was referring to the installation of security cameras.

Fong-Jeffries further testified that when Haven texted her that he needed a new toy, he was referring to a gun. She testified that a gun found on Haven was registered to her father, Buck Fong. She told the jury that Haven had wanted to buy the gun, but she had not wanted to sell it to him. She did not discover that the gun was missing from her car until after Haven was arrested.

1
2

Fong-Jeffries admitted that she prepared the retraction letter that was eventually sent to the district attorney's office purportedly by Quillen. However, she did not sign it.

3
4

On cross-examination, Fong-Jeffries explained that she had asked Haven to delete all of the text messages because the people discussed in those messages were Jeffries's friends, and, while she did not want them around, she also did not want to fight with Jeffries about them.

5
6
7
8
9

Fong-Jeffries testified that, while Jeffries "didn't think it was cool ... that [Ortega] had gotten with his ex," he did not particularly care that Ortega had slept with Quillen. Fong-Jeffries explained that, by that time, Jeffries was with her. She also testified on cross-examination that Jeffries told her that "he was sending texts out to people about how much he loved Amy Quillen just to track her to serve a restraining order." According to Fong-Jeffries, they deliberately "made it seem like we had split up just so we could find out where she was."

10
11
12

On cross-examination, Fong-Jeffries testified that, when she was arrested on June 13, she told detectives that Haven had told her he shot Ortega. She acknowledged that she never told law enforcement about this admission between April 25, and her arrest on June 13, during which time Jeffries was in custody for Ortega's murder.

13
14

### Defendant Haven's Case

15

Haven testified that he did not kill Ortega. Rather, on March 28, he witnessed Jeffries kill Ortega.

16
17
18
19
20
21
22

Haven testified that, during the time he was staying in an abandoned house across the street from the Altos Avenue apartments, Jeffries came over holding a baseball bat, accompanied by Curtis. He demanded to know where Ortega was. Jeffries saw Ortega and "went at [him] with the baseball bat." However, Curtis "wrapped him up" and urged Jeffries not to "do this here." Jeffries yelled at Ortega, accusing him of sleeping with or trying to sleep with Quillen. Ortega claimed that Quillen had hit on him, but that he never touched her. They all agreed to return to Jeffries's apartment and confront Quillen. Jeffries, Ortega, and Curtis all left. Fifteen to 20 minutes later, Curtis returned to the abandoned house where Haven was and asked if Ortega had come back, and Haven responded that he had not. Later that night, Haven saw Ortega with a .32-caliber gun.

23
24
25
26
27

The next day, Haven observed law enforcement officers at the Altos Avenue apartments. After the officers left, Haven went to the apartment complex and found out what had happened. Fong-Jeffries's name came up during the conversation. Haven had known Fong-Jeffries since childhood, as their mothers were close friends. When he was 13, Haven's family moved out of the neighborhood, and Haven and Fong-Jeffries fell out of touch for years. When her name arose, Haven told the person with whom he was speaking to tell him when she came over so that he could speak to her.

28

Later, someone notified Haven that Fong-Jeffries was moving into

15

the apartment complex. Haven recommended a particular bail bonds agent to Fong-Jeffries. He also went with her to meet with the agent and pay him. Later that night, Jeffries returned home. As Haven was leaving the apartment complex that night, he told Jeffries that he would be happy to help him with anything he needed.

After this, Haven's relationship with Jeffries changed. A couple of days later, Jeffries asked Haven to watch his apartment while he was gone. Then he asked him to watch his older son a couple of times. Haven started helping keep the house in order. Approximately one week after Jeffries's release from jail, Haven became involved in Jeffries's drug business. Haven offered to sell methamphetamine for him. From that point on, if Jeffries was not home, Haven would "take care of the business." He also began to make runs for Jeffries, dropping off product or picking up money. He would also meet with a supplier. Jeffries paid Haven in methamphetamine, as well as some cash.

At the beginning of March, Haven moved from the abandoned house to the Altos Avenue apartment directly above Jeffries's apartment. Jeffries provided Haven with a mobile phone. Initially, Jeffries allowed a number of people to use that phone. At some point between March 19 and 22, however, that phone was mostly in Haven's possession.

In mid-March, after having spent some time away from the area, Ortega started coming around the Altos Avenue apartment complex again. However, he would stop by very briefly, but would never stay long. Then he began to accompany Jeffries and Haven on trips they took out of town looking for Quillen. At first, it struck Haven as odd that Jeffries was spending time with Ortega again. At one point, Haven asked Jeffries why he was renewing acquaintances with Ortega, under the circumstances. Jeffries responded that Ortega had agreed to help him find Quillen and bring her home.

Haven acknowledged several text messages between him and Jeffries discussing whether Jeffries should trust Ortega. These included the message Haven sent to Jeffries in which he stated: "if he even looks like he's gonna try to fuck you over I give you my word I'm gonna take him down any means necessary." Haven explained that, if Ortega attempted to cross Jeffries, he would handle it, by which he meant "[a]t the most beating him up."

On March 19, Jeffries and Haven were coming from court on Power Inn Road in Jeffries's Yukon. Suddenly, the left front tire turned straight to the left, and the Yukon spun around. Once they managed to get the vehicle off of the road, Haven inspected it and saw that the tie rod had come apart. Upon closer inspection, Haven saw that the nut securing the tie rod was missing. Haven performed a temporary repair so that they could drive back to Altos Avenue, where Haven worked more extensively on the vehicle.

After the incident, Jeffries told Haven that he believed Ortega had tampered with the Yukon. Haven confirmed that the particular way in which the tie rod assembly had failed was not a defect that would

arise from road vibration or other normal wear and tear. Haven agreed that someone had tried to sabotage the truck and thought Curtis could have been the person, because Curtis was upset that Jeffries was no longer allowing him to stay at his apartment.

Haven began to perceive Ortega as a threat. In addition to the incident involving the Yukon, Jeffries told Haven that Ortega was jealous of Haven, and angry that Haven had essentially usurped his position of influence with Jeffries. On one occasion, Jeffries and Ortega were riding in the front of Jeffries's Yukon while Haven was in the back. Ortega was upset about the situation between him and Jeffries. Ortega looked at Haven and said to Jeffries, "Now you're riding around with this fucking guy?" Jeffries told Haven that Ortega wanted Haven out of the picture, and that he would use any means necessary.

At some point, Jeffries began to talk about "taking [Ortega] out." At first, when Jeffries began to talk this way in relation to the situation with Quillen, Haven did not believe that Jeffries was serious. However, he later came to believe that Jeffries's desire to have Ortega killed was genuine. Additionally, Haven spoke with Jeffries about the possibility of Haven killing Ortega because Haven was genuinely concerned that Ortega was going to kill him first.

Haven agreed to help Jeffries kill Ortega. (6 RT 1726) He did not agree because Ortega had a relationship with Quillen, and he did not agree merely to help Jeffries. He told the jury he did it because he felt that Ortega was a threat to his life.

Jeffries proposed that they lure Ortega out on jobs, such as stealing cars, so that Haven could shoot him. Haven agreed. After prior attempts to lure Ortega out failed, on March 27, Haven and Jeffries drove to Ortega's mother's apartment in Fong-Jeffries's car to pick Ortega up. Haven testified that he did not know whether Jeffries was armed. They stayed at Ortega's mother's apartment for approximately 20 or 25 minutes. Haven smoked methamphetamine with Ortega. Thereafter, Haven, Jeffries, and Ortega left to look for a "pot farm" Ortega knew of. After they were frustrated in their plan to steal marijuana plants, Ortega became despondent, as he needed money and a car. Haven indicated that he had shaved keys at his apartment, so they went and retrieved the shaved keys, and Haven gave them to Ortega. Ortega and Haven smoked again. They then drove off looking for a car to steal.

At one point, Haven and Ortega exited the vehicle and walked up towards a driveway. However, Haven told Ortega he thought he saw someone on the porch. When asked if it was Haven's plan to actually steal a car from that property, Haven responded that "[i]n a way it was something different." He clarified, "It was one of the opportunities that I had to shoot ... Ortega." Haven also admitted that, at this time, he texted Jeffries, "Next spot I'm doing him." Haven stated that "at that time that was [his] ... plan." According to Haven, he then texted, "Beating the brakes off this lame." By sending this text, Haven's intention was to cover up the fact, suggested by his prior text, that he planned to shoot Ortega.

At some point during the night, Haven changed his mind about shooting Ortega. He testified that he had the opportunity to shoot Ortega when they were attempting to steal marijuana plants, but he decided not to because he was not a killer. He also had the opportunity to shoot Ortega near the house where they planned to steal a car, but, again, he did not do so. Later, in a more remote area in Elverta, Haven had the opportunity to shoot Ortega when all three got out of the car to urinate. However, he did not shoot Ortega. Thereafter, they drove for 15 to 20 minutes until they arrived at Kasser Road.

They approached the Wenger residence on Kasser Road and drove by slowly. They made a U-turn and stopped on the road between the Wenger residence and the next house. All three exited the vehicle. Haven walked beside Ortega, and they shared a cigarette. Haven then heard a gunshot. He turned around and saw Jeffries walking towards Ortega firing a gun at him. Haven heard Jeffries fire three rounds. Haven then looked at Ortega and saw him spin around and fall down backwards. After Jeffries shot Ortega, he told Haven to "get in the fucking car." Haven did, and they left.

Haven testified that, at some point prior to the shooting, he had stopped wanting Ortega dead. While he had wanted Ortega dead at one point because he thought Ortega was going to kill him, eventually, he either changed his mind or could not do it.

As they drove back to the Altos Avenue apartments after the shooting, Haven and Jeffries both attempted to contact Villanueva because Jeffries's plan was to give her the gun. Having failed to reach Villanueva, Jeffries instructed Haven to give the gun to Ricky Chesser until they could get it to Villanueva. Jeffries told Haven that, if he was questioned by police, he was to say that they had been out in Jeffries's Yukon and it broke down on Roseville Road. Therefore, they had to walk to Jeffries's friend Keith Davenport's house so that he could help them fix the truck and get home. When asked why he went along with Jeffries in telling this cover story, Haven stated that he was scared of Jeffries, because he had "just watched him blow somebody away, [and] [he] didn't want to be next." Jeffries also asked Haven if he knew how to get rid of gunshot residue, and Haven responded that he would try to find out.

Back at the Altos Avenue apartments, Jeffries gave Haven the .357. Haven wrapped it in a red shirt and gave it to Chesser and told him to hang onto it. Haven asked McQueen if he could borrow some clothes, and he also asked him to take the clothes he had been wearing and burn them. Haven also asked McQueen if he knew how to get rid of gunshot residue. McQueen offered some advice, and Haven relayed that information to Jeffries.

The following day, Villanueva came by the apartments and picked up the gun. Haven handed the gun, wrapped in a cloth, to Villanueva. The same day, when Haven texted Fong-Jeffries that she, Jeffries, and the kids were "a little bit safer now," he was referring to the security cameras. When he texted Fong-Jeffries asking whether he could trust her and Jeffries, he was referring to the events of the night

before. Having watched Jeffries shoot Ortega, Haven was afraid of him and wanted to be sure that Jeffries did not see him as a liability. Similarly, when he texted that he knew the "loyalty goes both ways," and that, otherwise, he would not have done what he did, he was referring to agreeing to go along with the cover story and getting rid of the murder weapon.

As for his text to Fong-Jeffries about not trusting Curtis, Haven testified that Curtis had already attempted to stab him once. During a drug deal, Curtis pulled a knife on Haven, and Haven pulled out the nine-millimeter. Haven testified that, when he and Fong-Jeffries texted each other to the effect that Wilkey and Curtis "are next," he meant that they needed to be "out of the picture." However, by this, he did not mean that they should be killed. Rather, he only meant that they needed to be "[g]one," and "away from" Haven, Jeffries, and Fong-Jeffries.

Haven acknowledged that he possessed firearms at various times. He had a nine-millimeter handgun which he acquired from Fong-Jeffries. Fong-Jeffries gave Haven the gun because, with Jeffries's domestic violence case ongoing, she did not want it in their apartment. Haven also stored a sawed-off shotgun for a couple of days until Villanueva picked it up. Additionally, he stored the .357-caliber handgun for one night, the night Ortega was shot. Haven testified that, when he texted Fong-Jeffries about obtaining more ammunition, he was referring to ammunition for the nine-millimeter that she had given to him, not the .357.

Haven testified that, following his arrest, he spoke with law enforcement about this case on three occasions. The day he was arrested, he took the arresting officers to Villanueva's storage unit and told them that the .357 revolver they found in the storage unit was possibly the gun used in Ortega's murder. However, he did not tell them that Jeffries shot Ortega because he was still afraid of Jeffries. Shortly thereafter, Haven spoke with Detective McCue. They discussed the fact that the .357 may be the murder weapon, but Haven denied involvement in the murder or knowing who committed it. A couple of months later, Haven spoke with Detectives McCue and Swisher, and this time told them that he saw Jeffries shoot Ortega.

Haven denied ever telling Fong-Jeffries, Dustin, or anyone else that he shot Ortega. He acknowledged that, in an interview with detectives after his arrest, he told them that Fong-Jeffries knew Jeffries was planning to kill Ortega. However, he further testified that he and Jeffries did not discuss their plan in front of Fong-Jeffries. Rather, according to Haven, his belief that Fong-Jeffries knew about the plan was based on the fact that Jeffries had told him that he discussed the plan with Fong-Jeffries.

After all parties rested, Haven was permitted to reopen his case to present the testimony of Carla Huffman, who was housed in the same pod in the Sacramento County Jail as Fong-Jeffries. Huffman testified that inmates can pass written communications through the plumbing by what inmates refer to as a "fishing line" or a "kite."

19

Huffman testified that, when Fong-Jeffries learned that Huffman and her roommate were "fishing back and forth to the boys upstairs on the 8th floor," she asked Huffman to "pass some mail." Huffman sent kites for Fong-Jeffries three or four times. Huffman testified that she read the kites she sent and received for Fong-Jeffries. When Fong-Jeffries gave Huffman two additional kites to send, Huffman contacted the district attorney's office and offered to exchange the kites for a better deal on her case. Huffman turned the two kites over to a representative for the district attorney's office.

According to Huffman, when Fong-Jeffries gave her one of the earlier kites to send, she stated that she had to go to court to testify, and that she "needed the questions in the kites answered as soon as possible ...." Huffman testified: "In all the kites, she needed to know what to say because it was her turn to testify, and she was scared."

Huffman also testified that Fong-Jeffries once asked her if she could be in trouble for giving someone a gun. When Huffman responded that she could, Fong-Jeffries stated that she had given Jeffries a gun. Although in this conversation, Fong-Jeffries did not specify the type of gun she had given to Jeffries, Huffman had seen a reference in the first kite to a .357. She also referred to the fact that Jeffries had killed someone named Ortega. In one of the kites, there was a question as to whether she was supposed to say that Jeffries picked her up from work on a particular day, even though Fong-Jeffries told Huffman that he had not picked her up from work.

Haven also called Fong-Jeffries. She acknowledged that three exhibits were letters that she had written to Jeffries while incarcerated with the intention of having them delivered to him. She also acknowledged that there had been additional letters. Fong-Jeffries testified that she had solicited others in addition to Huffman to send kites to Jeffries. She acknowledged that, in her kites, she had asked Jeffries how she should answer questions or explain certain facts during her testimony. However, she also testified that she "wasn't looking for [Jeffries] to answer [her] questions." Instead, her letters contained both questions and answers. She was merely "looking for [Jeffries] to read this over to see if that's all [she] needed to go by." She wanted him to point out if she had missed anything. In a letter in which she expressed that she hoped he would answer her questions, she was referring to questions about how the family was doing, not questions about the case. She subsequently testified that she was not trying to "get [her] testimony together with ... Jeffries through these written communications." She denied writing anything in a letter about whether Jeffries picked her up from work on a given day. She also denied ever talking with Huffman about her case.

Fong-Jeffries testified, for the first time, that Haven had threatened her. She stated that she had previously indicated that she was worried for her own welfare and that of her family. When asked why she had not specifically testified before that Haven had threatened her, she responded that no one had asked.

Fong-Jeffries testified that she never told anyone in her pod that

Jeffries killed Ortega.

**Defendant Fong-Jeffries's Rebuttal Case**

Fong-Jeffries presented the testimony of Roshann Harris as a rebuttal witness. Harris testified that Fong-Jeffries was her cellmate at the Sacramento County Jail. Harris testified that, in her presence, Fong-Jeffries never talked about her case. She testified that Fong-Jeffries was a very quiet person and did not speak much with anyone.

Harris testified that she had come to know Huffman at the jail. She had observed Huffman attempting to gather information from other inmates about their cases. Harris never saw Fong-Jeffries talk to Huffman.

**Verdicts and Sentencing**

The jury found Jeffries guilty of murder in the first degree with the special circumstance that he intentionally killed Ortega by means of lying in wait. However, the jury found not true the enhancement alleging personal use of a firearm pursuant to section 12022.53, subdivision (d). The jury further found Jeffries guilty of possession of a firearm by a felon, willful infliction of corporal injury on Amy Quillen, possession of a controlled substance, and falsifying a document. The court sentenced Jeffries to an indeterminate term of life without the possibility of parole on the murder count, a consecutive determinate term of five years on the count of infliction of corporal injury, the principal term of the determinate portion of the sentence (see generally § 1170.1), and consecutive terms of eight months on each of the remaining counts, resulting in an aggregate sentence of seven years determinate plus life without the possibility of parole.

The jury found Haven guilty of murder in the first degree with the special circumstance that he intentionally killed Ortega by means of lying in wait. However, the jury found not true the enhancement alleging personal use of a firearm pursuant to section 12022.53, subdivision (d). The jury further found Haven guilty of possession of a firearm by a felon (two counts), possession of a controlled substance, and falsifying a document. The court sentenced Haven to an indeterminate term of life without the possibility of parole on the murder count, a consecutive determinate term of two years imprisonment on one count of possession of a firearm by a felon, the principal term of the determinate portion of the sentence, and consecutive terms of eight months on each of the remaining counts, resulting in an aggregate sentence of four years determinate plus life without the possibility of parole.

The jury found Fong-Jeffries guilty of murder in the first degree with the special circumstance that she intentionally killed Ortega by means of lying in wait. The jury further found Fong-Jeffries guilty of falsifying a document. The court sentenced Fong-Jeffries to an indeterminate term of life without the possibility of parole on the murder count and a consecutive determinate term of two years on the falsifying a document count, resulting in an aggregate sentence of

1   two years determinate plus life without the possibility of parole.

2   (ECF No. 34-26); People v. Haven, C074940, 2019 WL 4051881, at *1-16 (Cal. Ct. App. Aug.

3   28, 2019).

4   IV.   Standards for a Writ of Habeas Corpus

5       An application for a writ of habeas corpus by a person in custody under a judgment of a

6   state court can be granted only for violations of the Constitution or laws or treaties of the United

7   States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation

8   or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire,

9   502 U.S. 62, 67-68 (1991).

10      Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

11   corpus relief:

12      An application for a writ of habeas corpus on behalf of a person in
        custody pursuant to the judgment of a State court shall not be granted
13      with respect to any claim that was adjudicated on the merits in State
        court proceedings unless the adjudication of the claim -
14

15          (1) resulted in a decision that was contrary to, or involved an
        unreasonable application of, clearly established Federal law, as
        determined by the Supreme Court of the United States; or
16

17          (2) resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented in the
        State court proceeding.
18

19   28 U.S.C. § 2254(d).

20      For purposes of applying § 2254(d)(1), "clearly established Federal law" consists of

21   holdings of the Supreme Court at the time of the last reasoned state court decision.  Thompson v.

22   Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45

23   (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S.

24   362, 412 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly

25   established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859

26   (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may

27   not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a

28   specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 133 S.

1   Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)).

2   Nor may it be used to "determine whether a particular rule of law is so widely accepted among

3   the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct."

4   Id.  Further, where courts of appeals have diverged in their treatment of an issue, there is no

5   "clearly established federal law" governing that issue.  See Carey v. Musladin, 549 U.S. 70, 77

6   (2006).

7           A state court decision is "contrary to" clearly established federal law if it applies a rule

8   contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

9   precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).

10  Under the "unreasonable application" clause of § 2254(d)(1), "a federal habeas court may grant

11  the writ if the state court identifies the correct governing legal principle from [the Supreme

12  Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case."[2]

13  Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); see also Chia v.

14  Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, "a federal habeas court may not issue

15  the writ simply because that court concludes in its independent judgment that the relevant state-

16  court decision applied clearly established federal law erroneously or incorrectly.  Rather, that

17  application must also be unreasonable."  Williams, 529 U.S. at 411; see also Schriro v. Landrigan,

18  550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 ("It is not enough that a federal habeas court,

19  in its 'independent review of the legal question,' is left with a '"firm conviction"' that the state

20  court was '"erroneous"'").  "A state court's determination that a claim lacks merit precludes

21  federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state

22  court's decision."  Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v.

23  Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus

24  from a federal court, a state prisoner must show that the state court's ruling on the claim being

25  presented in federal court was so lacking in justification that there was an error well understood

26  _____

27  [2]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
    overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
    presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,

28  384 F.3d 628, 638 (9th Cir. 2004)).

1    and comprehended in existing law beyond any possibility for fair-minded disagreement." Id. at

2    103.

3         If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

4    court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford,

5    527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

6    (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

7    § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

8    considering de novo the constitutional issues raised.").

9         The court looks to the last reasoned state court decision as the basis for the state court

10   judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

11   If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

12   previous state court decision, this court may consider both decisions to ascertain the reasoning of

13   the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a

14   federal claim has been presented to a state court and the state court has denied relief, it may be

15   presumed that the state court adjudicated the claim on the merits in the absence of any indication

16   or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption

17   may be overcome by a showing "there is reason to think some other explanation for the state

18   court's decision is more likely." Id. at 99-100. Similarly, when a state court decision on

19   petitioner's claims rejects some claims but does not expressly address a federal claim, a federal

20   habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the

21   merits. Johnson v. Williams, 568 U.S. 289, 298-301 (2013) (citing Richter, 562 U.S. at 98). If a

22   state court fails to adjudicate a component of the petitioner's federal claim, the component is

23   reviewed de novo in federal court. See, e.g., Wiggins v. Smith, 539 U.S. 510, 534 (2003).

24        Where the state court reaches a decision on the merits but provides no reasoning to

25   support its conclusion, a federal habeas court independently reviews the record to determine

26   whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v.

27   Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo

28   review of the constitutional issue, but rather, the only method by which we can determine whether

24

1  a silent state court decision is objectively unreasonable." <u>Himes</u>, 336 F.3d at 853.  Where no

2  reasoned decision is available, the habeas petitioner has the burden of "showing there was no

3  reasonable basis for the state court to deny relief." <u>Richter</u>, 562 U.S. at 98.

4         A summary denial is presumed to be a denial on the merits of the petitioner's claims.

5  <u>Stancle v. Clay</u>, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze

6  just what the state court did when it issued a summary denial, the federal court reviews the state

7  court record to "determine what arguments or theories . . . could have supported the state court's

8  decision; and then it must ask whether it is possible fairminded jurists could disagree that those

9  arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

10  Court." <u>Richter</u>, 562 U.S. at 101.  It remains the petitioner's burden to demonstrate that 'there

11  was no reasonable basis for the state court to deny relief.'" <u>Walker v. Martel</u>, 709 F.3d 925, 939

12  (9th Cir. 2013) (quoting <u>Richter</u>, 562 U.S. at 98).

13         When it is clear, however, that a state court has not reached the merits of a petitioner's

14  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

15  habeas court must review the claim de novo.  <u>Stanley</u>, 633 F.3d at 860 (citing <u>Reynoso v.</u>

16  <u>Giurbino</u>, 462 F.3d 1099, 1109 (9th Cir. 2006)).

17  V.  <u>Petitioner's Claims</u>

18         A.  <u>Claim One: Failure to Instruct on Natural and Probable Consequences Doctrine</u>

19         Petitioner claims that "prejudicial error occurred when the trial court failed to instruct on

20  the natural and probable cause doctrine with [assaults] as target crimes" and second-degree

21  murder as the consequence.  (ECF No. 23 at 4, 8-17.)  In response, respondent argues petitioner

22  has not shown that the state court's determination was unreasonable or based on an unreasonable

23  finding of fact.  (ECF No. 35 at 22.)

24         On direct appeal, the state court considered and rejected petitioner's claim.

25         Jeffries asserts that the California Supreme Court in *Chiu, supra*, 59
    Cal.4th 155, created a new, lesser included offense of second degree
26         murder based on aiding and abetting a lesser crime where murder
    results as a natural and probable consequence. He claims this new,
27         lesser included offense arguably applied to him because substantial
    evidence supported the premise that he only intended Haven to
28         "administer a beating to, or otherwise assault" Ortega. Jeffries claims

that, because the trial court had the duty to instruct, sua sponte, on lesser included offenses, he can raise this claim despite the fact that he did not seek such an instruction before the trial court. He asserts that he could have been found guilty of second degree murder, as a lesser included offense of first degree murder, under any theory of derivative liability, including aiding and abetting and under the natural and probable consequences doctrine. We disagree.

"It is well established that even in the absence of a request, the trial court has a sua sponte duty to instruct on lesser included offenses when there is substantial evidence the defendant is guilty only of the lesser offense. [Citation.] This requirement is based upon the rule that 'the court must instruct sua sponte on "the 'general principles of law governing the case;' " i.e., those " 'closely and openly connected with the facts of the case before the court.' " [Citations.]' [Citations.] [Other] cases have found the requirement is based upon the defendant's ' "constitutional right to have the jury determine every material issue presented by the evidence." ' " (*People v. Cook* (2001) 91 Cal.App.4th 910, 917.)

Jeffries contends that the trial court had a duty to instruct the jury, sua sponte, on the "new, potential lesser included offense of second degree murder based on aiding and abetting a lesser crime where murder resulted as a natural and probable consequence." However, the sua sponte duty to instruct on the natural and probable consequences doctrine that is imposed where necessary to the jury's understanding of the charge and because the instructions are closely and openly connected with the facts of the case "is quite limited. It arises only when the prosecution has elected to *rely* on the 'natural and probable consequences' theory of accomplice liability and the trial court has determined that the evidence will support instructions on that theory." (*People v. Prettyman* (1996) 14 Cal.4th 248, 269 (*Prettyman*).) The prosecutor here did not rely on the natural and probable consequences doctrine, and did not request that the jury be instructed with regard thereto. Thus, "it was not one of the 'general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case.' " (*Id.* at p. 270.) We are not persuaded by Jeffries's argument that, notwithstanding our high court's pronouncement in *Prettyman*, following *Chiu*, trial courts have a duty to instruct the jury on the natural and probable consequences doctrine, despite the fact that the prosecution does not rely on it, based on the court's general obligation to instruct on all lesser included offenses supported by substantial evidence. We thus, reject Jeffries's claim that, in *Chiu*, the California Supreme Court, in effect, created a new theory of liability about which the court here had a duty to sua sponte instruct the jury.

Haven, 2019 WL 4051881, at *30.

Petitioner's claim rests on an interpretation of state law. He again argues that the California Supreme Court created a new theory of liability (a new, lesser included offense of second degree murder based on aiding and abetting a lesser crime where murder results as a

26

natural and probable consequence), and the trial court erred in failing to sua sponte instruct the jury on this lesser offense.  The state court disagreed, stating that the sua sponte duty is limited to when the prosecution relies on the natural and probable consequences theory of accomplice liability and the trial court determines that there is evidence to support the theory.  Haven, 2019 WL 4051881, at *30.  It concluded that the duty does not apply here because the prosecutor did not rely on that doctrine nor did he request the instruction, and the instruction was not commonly or closely or openly connected to the case such that it was necessary to the jury's task.  Id. Federal habeas corpus relief is only available for violations of federal law.  See Wilson, 562 U.S. at 5; Estelle, 502 U.S. at 67-68.  It is axiomatic that a state court's interpretation of state law is binding on a federal habeas court.  Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per curiam); Estelle, 502 U.S. at 71-72.  Petitioner cannot transform a state law issue into a federal issue by blanketly claiming a violation of due process.  Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996).  Furthermore, the Ninth Circuit has stated that "[f]ailure of a state court to instruct on a lesser offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding."  James v. Reece, 546 F.2d 325, 327 (9th Cir. 1976); see also Alcantara v. Rackley, 554 F. App'x 674, 675 (9th Cir. 2014); Solis v. Garcia, 219 F.3d 922, 928-30 (9th Cir. 2000) (noting that the Supreme Court has not decided whether due process requires a lesser included offense instruction in certain instances for non-capital defendants).  Because this Court cannot second-guess the state court's interpretation of state law, this argument fails.  This Court concludes that the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law, or that such a finding was based on an unreasonable application of the facts and recommends denying habeas relief on this claim.

B.  Claim Two: Admission of Prior Domestic Violence Evidence

Petitioner claims that the trial court improperly denied his motion to exclude all character evidence of prior domestic violence.  (ECF No. 23 at 4, 17-23.)  He takes particular issue with Quillen's statement that petitioner threatened her with a gun in 2007.  (Id. at 19.)  In response, respondent argues that the state court's rejection of this evidence claim was reasonable.  (ECF No. 35 at 22.)

In the last well-reasoned opinion, the state court evaluated and denied petitioner's claim.

Jeffries asserts that the trial court erred in denying his in limine motion to exclude evidence of prior domestic violence. Jeffries claims that, pursuant to the provisions of Evidence Code sections 1109 and 352, the court erred in admitting this evidence given its negligible probative value and the extremely prejudicial effect it would have on the jury. Jeffries claims that the relevant limiting instruction failed to mitigate the unfair prejudice resulting from the introduction of this evidence. Jeffries also claims that the improper admission of this evidence deprived him of a fair trial.

We conclude that the trial court did not abuse its discretion in denying Jeffries's in limine motion. The probative value of this evidence was not substantially outweighed by the danger of undue prejudice. We further conclude that the introduction of this evidence did not deprive Jeffries of a fair trial.

**A. Additional Background**

As the court addressed the parties' motions in limine, the prosecutor objected to Jeffries's in limine motion to exclude evidence that he had sustained any criminal conviction, including crimes of moral turpitude. The prosecutor noted that Jeffries had two prior convictions for violations of section 273.5, one in 2008, a felony, and another in 2004, a misdemeanor. The court noted that one of the prior victims was Quillen, and the other conviction involved a different person. With regard to the facts underlying the incident resulting in the 2008 conviction, the prosecutor stated that Jeffries became angry with Quillen, punched her legs, and head-butted her, and, on another occasion, he brandished a gun and threatened to kill her. The court noted that, in the charged offense, the People alleged that Jeffries punched Quillen in the face, split her lip, prevented her from leaving, and threatened to kill her. The prosecutor asserted Evidence Code section 1109 applied, and further noted that Jeffries was charged with similar crimes in the instant case.

Defense counsel argued that such evidence should be barred as unduly prejudicial pursuant to Evidence Code section 352, because the prior convictions were too similar to the charged offenses, and, therefore, the jury would assume guilt since Jeffries had been found guilty of the same crimes previously. Defense counsel claimed that, particularly in light of the fact that this was a murder case, the evidence the prosecutor sought to introduce would be prejudicial as to all of the charges. Essentially, defense counsel argued that the jury would hear the evidence of the prior convictions and conclude that "that's the type of person he is." Thus, according to defense counsel, this evidence was unduly prejudicial.

The court stated that it considered the facts of the prior case and the instant case, corroboration, and remoteness. The court noted that the victim in the 2008 conviction and in this case were the same, and therefore the presentation of evidence as to the prior incident would not be unduly time-consuming. The court also stated that the earlier incident occurred within five years of this case, and was thus, not

28

remote. The court also observed that the prior incident resulted in a conviction. The court concluded that the facts underlying the prior incident were not more inflammatory than those at issue in this case. The court also determined that it was unlikely that the jury would misuse the evidence concerning the prior case in considering the charges in this case. In addition, the court stated that any confusion would be allayed by CALCRIM No. 852.[14]

[N.14 This is now CALCRIM No. 852A.]

The court expressly ruled that the probative value of the evidence was not substantially outweighed by the probability that the admission of the evidence would necessitate undue consumption of time or create a substantial danger of undue prejudice, confusing the issues, or misleading the jury. Accordingly, the court denied Jeffries's motion, ruling that this evidence was admissible.

## B. Relevant Legal Principles and Standard of Review

"Except as provided in subdivision (e) or (f),[15] in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101[16] if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1109, subd. (a)(1).)

[N.15 Subdivisions (e) and (f) address circumstances not relevant here.]

[N.16 Evidence Code section 1101, subdivision (a), provides: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."]

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) We review a trial court's rulings on the admissibility of evidence for abuse of discretion. (*People v. Benavides* (2005) 35 Cal.4th 69, 90.) "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues.*' " (*People v. Karis* (1988) 46 Cal.3d 612, 638, italics added; *People v. Holford* (2012) 203 Cal.App.4th 155, 167.) "Evidence is not

inadmissible under section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights." (*Holford*, at p. 167.)

" 'The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense. Other factors affecting the probative value include the extent to which the source of the evidence is independent of the charged offense, and the amount of time between the uncharged acts and the charged offense. The factors affecting the prejudicial effect of uncharged acts include whether the uncharged acts resulted in criminal convictions and whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses.' " (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274.)

**C. Analysis**

The uncharged offense at issue here was the 2008 felony conviction pursuant to section 273.5. In the underlying incident, which occurred in 2007, Jeffries became angry with Quillen, punched her legs, and head-butted her, and, on another occasion, he brandished a gun and threatened to kill her. In the charged offense, the People alleged that Jeffries punched Quillen in the face, split her lip, prevented her from leaving, and threatened to kill her. These incidents are substantially similar. Additionally, the 2008 conviction was not remote in reference to the 2012 domestic violence offense charged in the instant case.

As to the factors addressed to prejudice, the 2007 incidents resulted in a conviction in 2008. Accordingly, there is no risk that the jury here would be motivated to punish Jeffries for the uncharged offense. (See *People v. Walker* (2006) 139 Cal.App.4th 782, 806.) Additionally, in this case involving charges including first degree murder, as well as Jeffries's violence against Quillen, the uncharged acts evidence was neither stronger nor more inflammatory than the evidence relating to the charged offenses.

Jeffries claims that the introduction of evidence pertaining to the 2007 incidents was unduly prejudicial because, during those incidents, he allegedly brandished a handgun, thus demonstrating his "predisposition to kill with a gun." However, the fact that the evidence indicated that Jeffries used a handgun in the 2007 incident involving Quillen did not tip the balance in favor of a finding that the probative value of this evidence was substantially outweighed by the risk of undue prejudice. Additionally, as the People observe, the court instructed the jury, pursuant to CALCRIM No. 852, that this evidence was introduced for the limited purpose of deciding whether Jeffries had committed the charged domestic violence offense against Quillen, and it was not to be considered for any other purpose.

Accordingly, we conclude that the trial court did not abuse its discretion in denying Jeffries's in limine motion to preclude this evidence. Moreover, because we conclude that the introduction of this evidence was proper, we reject Jeffries's claim that its

1       introduction violated his right to a fair trial.

2   Haven, 2019 WL 4051881, at *30-33.

3           Petitioner seeks habeas relief on the grounds that the trial court erred by admitting

4   evidence of prior domestic violence against Quillen.  State law determines whether evidence is

5   admissible.  See Estelle, 502 U.S. at 67-68; Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.

6   2009).  Here, the state court concluded that the 2008 conviction was substantially similar to and

7   not remote from the 2012 domestic violence offense charged in this case.  Haven, 2019 WL

8   4051881, at *32.  It also determined that the "uncharged acts evidence was neither stronger nor

9   more inflammatory than the evidence relating to the charged offenses" and was not unduly

10  prejudicial.  Id. at *33.  Any errors of state law made by the state court do not warrant federal

11  habeas relief.  See Estelle, 502 U.S. at 67-68.  "The admission of evidence does not provide a

12  basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due

13  process."  Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995).

14          Under the Antiterrorism and Effective Death Penalty Act, "even clearly erroneous

15  admissions of evidence that render a trial fundamentally unfair may not permit the grant of

16  federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by

17  the Supreme Court."  Holley, 568 F.3d at 1101; see also Walden v. Shinn, 990 F.3d 1183, 1204

18  (9th Cir. 2021).  Because the Supreme Court has "not yet made a clear ruling that admission of

19  irrelevant or overly prejudicial evidence constitutes a due process violation sufficient to warrant

20  issuance of the writ," Holley, 568 F.3d at 1101, this Court cannot conclude that the state court's

21  ruling was contrary to, or an unreasonable application of, clearly established federal law.  See

22  generally Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per curiam); Chavarria v. Hamlet, 472

23  F. App'x 749, 750 (9th Cir. 2012); Delira v. Runnels, 213 F. App'x 580 (9th Cir. 2006)

24  (concluding that admission of past acts of domestic violence under California Evidence Code

25  section 1109 did not warrant habeas relief).  The Supreme Court has never held that propensity

26  evidence violates due process.  See Estelle, 502 U.S. at 75 n.5 ("[W]e express no opinion on

27  whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes'

28  evidence to show propensity to commit a charged crime.").  Accordingly, this Court recommends

1    denying habeas relief on this claim.

2         C.  Claim Three: Improper Admission of Uncharged Offenses as Propensity Evidence

3         Next, petitioner asserts that admission of uncharged offenses as propensity evidence

4    deprived him of equal protection and due process of law.  (ECF No. 23 at 5, 24-29.)  In response,

5    respondent argues the state court's rejection of this evidence claim was reasonable.  (ECF No.

6    35.)

7         The state court rejected petitioner's claim on the merits.

Jeffries asserts that the introduction of other crimes evidence pursuant to Evidence Code section 1109, for the sole reason of proving propensity, deprived him of equal protection and due process. As Jeffries acknowledges,[17] the California Supreme Court and the Courts of Appeal have rejected these and similar claims, as we do now.

[N.17 Jeffries acknowledges that his arguments have been rejected by the relevant body of case law, but asserts them nonetheless in the interest of preservation.]

Evidence Code section 1108 is similar to Evidence Code section 1109, but addresses criminal actions in which the defendant is accused of a sexual offense. The California Supreme Court has rejected a challenge to Evidence Code section 1108 advanced on identical due process grounds as those Jeffries raises here in connection with Evidence Code section 1109. (See *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*).) Our high court reasoned that Evidence Code section 352, the application of which is expressly contemplated in both Evidence Code sections 1108 and 1109, serves as a built-in safeguard, granting the courts the authority to preclude the admission of evidence whenever the probative value of the evidence is substantially outweighed by its potential undue prejudicial effect. (*Falsetta*, at pp. 916-918.) Our high court has since adhered to its earlier holding in *Falsetta*. (See *People v. Loy* (2011) 52 Cal.4th 46, 60-61 [rejecting defendant's request to reconsider *Falsetta*, noting that defendant provided no good reason to do so].)

The Courts of Appeal, including this court, have uniformly followed the reasoning in *Falsetta* in determining that, like Evidence Code section 1108, Evidence Code section 1109 does not violate due process. (See *People v. Johnson* (2010) 185 Cal.App.4th 520, 529, and cases cited therein.) Similarly, the Courts of Appeal have rejected equal protection claims related to Evidence Code section 1109. (See *People v. Brown* (2011) 192 Cal.App.4th 1222, 1233, fn. 14; *People v. Price* (2004) 120 Cal.App.4th 224, 240; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1311-1313.) We will not revisit these decisions here. Accordingly, we conclude that Jeffries's contention that Evidence Code section 1109 violates the guarantees of due process and equal protection is without merit.

32

1    Haven, 2019 WL 4051881, at *33.

2           To the extent petitioner claims that California Evidence Code section 1109 is

3    unconstitutional on its face and violated his rights to due process and equal protection, this

4    argument lacks merit.  In United States v. LeMay, 260 F.3d 1018 (9th Cir. 2001), the Ninth

5    Circuit held that Federal Rule of Evidence 414, a rule analogous to California Evidence Code

6    section 1109, did not violate the Due Process Clause because "there is nothing fundamentally

7    unfair about the allowance of propensity evidence" under this rule.  Id. at 1026.  "As long as the

8    protections of Rule 403 remain in place to ensure that potentially devastating evidence of little

9    probative value will not reach the jury, the right to a fair trial remains adequately safeguarded."

10   United States v. LeMay, 260 F.3d 1018, 1026 (9th Cir. 2001).  Rule 403 is similar to the

11   safeguards in California Evidence Code section 352.  In this case, the state court stated that

12   "Evidence Code section 352, the application of which is expressly contemplated in both Evidence

13   Code sections 1108 and 1109, serves as a built-in safeguard, granting the courts the authority to

14   preclude the admission of evidence whenever the probative value of the evidence is substantially

15   outweighed by its potential undue prejudicial effect."  Haven, 2019 WL 4051881, at *33.  This

16   Court concludes that the state court's denial of his due process claim was not objectively

17   unreasonable.

18          The Ninth Circuit in LeMay also concluded that Rule 414 does not violate the Equal

19   Protection Clause because it does not discriminate against any group of individuals based on a

20   suspect or quasi-suspect class and does not infringe on a fundamental right.  Id. at 1030.  The

21   Ninth Circuit stated that the rule is constitutional if it bears a reasonable relationship to a

22   legitimate government interest.  It held that Rule 414 met that standard because prosecuting

23   crimes effectively is a legitimate governmental interest, and the rule furthered that interest by

24   allowing prosecutors to introduce evidence to help convict sex offenders.  Id. at 1031.  The same

25   reasoning applies in this case.  "Here, the class of intimate partner batterers, just as the class of

26   sex offenders, are not a suspect or quasi-suspect class, and § 1109 bears a reasonable relationship

27   to the legitimate government interest in the effective prosecution of domestic violence cases."

28   Duarte v. Covello, No. 2:15-cv-01902-JKS, 2020 WL 5518378, at *5 (E.D. Cal. Sept. 14, 2020);

33

see also Bottenfield v. Robertson, No. 2:19-cv-01105-JKS, 2019 WL 4640352, at *11 (E.D. Cal. Sept. 24, 2019); Daniel v. McDonald, No. EDCV 11-1164-ODW (MAN), 2013 WL 1898256, at *9-11 (C.D. Cal. Mar. 29, 2013).  The state court's rejection of petitioner's due process and equal protection challenges to California Evidence Code section 1109 was not contrary to, or an unreasonable application of, clearly established federal law.  This Court recommends denying habeas relief on this claim.

     D. <u>Claim Four: Improper Jury Instruction on Lying in Wait Special Circumstance</u>

     Petitioner argues that the jury should not have been instructed on lying in wait special circumstance because there was no proof that he intended or knew that the murder could be committed by lying in wait.  (ECF No. 23 at 5, 29-35.)  Specifically, he claims that CALCRIM No. 416 omitted a necessary element of the special circumstance.  (Id. at 34.)  In response, respondent argues this claim is not cognizable on habeas review.  (ECF No. 35.)

     On direct appeal, the state court considered and rejected this argument.

> Fong-Jeffries asserts that the instructions given by the court allowed her to be convicted of the lying-in-wait special circumstance without proof that she knew or intended the murder to be committed by lying in wait. Consistent with the discussion in part II, *ante*, we conclude that the trial court was not required to instruct the jurors that the People had to prove that Fong-Jeffries intended the murder to be committed by means of lying in wait. We further conclude that, even if the court was required to so instruct the jury, the charge, as a whole, was proper.[13]

> [N.13 Jeffries joins Fong-Jeffries in this argument. We reject his contentions for the same reasons as set forth herein with regard to Fong-Jeffries.]

> **A. Additional Background**

> The court instructed the jury with CALCRIM No. 401, "Aiding and Abetting: Intended Crimes." The instruction provided, in pertinent part, that the prosecution was required to prove that the defendant knew that the perpetrator intended to commit the crime, and that, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime. (CALCRIM No. 401.)

> The court also instructed the jury with CALCRIM No. 416, "Evidence of Uncharged Conspiracy," in relation to the murder count. That instruction provided, in part, that "[a] member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of

the conspiracy."

The court instructed the jury with CALCRIM No. 702, "Special Circumstances: Intent Requirement for Accomplice." That instruction provided, in pertinent part, that, to prove the special circumstance of murder by lying in wait as to a defendant who was not the actual killer but who was guilty of murder in the first degree as an aider and abettor, the People were required to prove that "the defendant acted with the intent to kill."

The court also instructed the jury with CALCRIM No. 728, "Special Circumstances: Lying in Wait." That instruction set forth the requirements to prove the special circumstance, and specifically provided that the People were required to prove, inter alia, that the "defendant intentionally killed ... Ortega," and that the defendant "committed the murder by means of lying in wait."

After the jury began deliberating, the jurors submitted a note to the court, asking: "Can someone be guilty of aiding [and] abetting to a special circumstance of lying in wait?" After consulting counsel, the court responded, "yes." The court directed the jurors to review CALCRIM Nos. 400 ("Aiding and Abetting: General Principles"), 401, and 702. The court further instructed the jury: "In order to convict a defendant of the special circumstance of murder by lying in wait, under the theory of aiding and abetting, the aider and abettor must share the requisite specific intent with the perpetrator, as defined in the instructions for lying in wait. [¶] An aider and abettor shares the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and aids, facilitates, promotes, encourages, or instigates the crime with the intent or purpose of facilitating the perpetrator's commission of the crime."

**B. Forfeiture**

As the People observe, Fong-Jeffries did not object to the special circumstances instructions. " 'Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights.' " (*Battle, supra*, 198 Cal.App.4th at p. 64, quoting *People v. Anderson* (2007) 152 Cal.App.4th 919, 927.) " 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087 (*Ramos*).) Thus, we consider the merits.

**C. Standard of Review**

We review claims of instructional error de novo. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.) We must review jury instructions based on how a reasonable juror would construe them. (*People v. Clair* (1992) 2 Cal.4th 629, 688.) "When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the

35

instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229 (*Houston*).)

### D. Analysis

The flaw in Fong-Jeffries's argument is her reliance on the premise that, to be punished pursuant to the lying-in-wait special circumstance, as an aider and abettor as opposed to the actual killer, the People were required to prove that she bore the specific intent that the murder be carried out by means of lying in wait. We have fully considered that claim, *ante*, and we have found it to be without merit.

In any event, we conclude that, even if the People were required to prove that Fong-Jeffries specifically intended that Ortega's murder be carried out by means of lying in wait, the trial court properly instructed the jurors in this regard. The court correctly instructed the jurors that, for Fong-Jeffries to be convicted as an aider and abettor, the People were required to prove that she knew that her codefendants intended to commit murder, and that, before or during the commission of the crime, she intended to aid and abet them in committing the crime. (CALCRIM No. 401.) The court further correctly instructed the jury that, to prove the special circumstance of murder by lying in wait as to a defendant who was not the actual killer but who was guilty of murder in the first degree as an aider and abettor, the People were required to prove that "the defendant acted with the intent to kill." (CALCRIM No. 702.) The court also correctly instructed the jury with CALCRIM No. 728 that the People were required to prove, inter alia, that the "defendant intentionally killed ... Ortega," and that the defendant "committed the murder by means of lying in wait." (CALCRIM No. 728.)

Viewing the instructions as a whole in the context of the trial record (see *Houston*, *supra*, 54 Cal.4th at p. 1229), we conclude that, even if the People were required to prove that Fong-Jeffries intended that Ortega's murder be carried out by means of lying in wait, the trial court properly instructed the jurors on this point at the outset. We disagree with Fong-Jeffries's claim that the foregoing instructions were "conflicting." Moreover, any shortcoming in these instructions was cured by the court's response to the jury question as to whether a defendant may be guilty of aiding and abetting a special circumstance of lying in wait. To this question, the court responded in the affirmative, and further instructed the jury: "In order to convict a defendant of the special circumstance of murder by lying in wait, under the theory of aiding and abetting, the aider and abettor must *share the requisite specific intent with the perpetrator*, as defined in the instructions for lying in wait. [¶] An aider and abettor *shares the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose* and aids, facilitates, promotes, encourages, or instigates the crime with the intent or purpose of facilitating the perpetrator's commission of the crime." (Italics added.)

Haven, 2019 WL 4051881, at *24-26.

36

1    Petitioner's claim is primarily based on state law, specifically whether the jury

2   instructions accurately conveyed California law regarding the elements of the lying-in-wait

3   special circumstance.  State law instructional errors, however, are not a basis for federal habeas

4   relief.  Estelle, 502 U.S. at 71-72.  As noted above, a petitioner cannot transform a state law issue

5   into a federal issue by merely claiming a violation of his rights to a jury trial and due process.

6   Langford, 110 F.3d at 1389.  Additionally, the state court concluded that the trial court properly

7   instructed the jury and denied that the instructions were conflicting.  Haven, 2019 WL 4051881,

8   at *25-26.  This Court cannot second-guess that interpretation of state law.  Bradshaw, 546 U.S.

9   at 76 (The Supreme Court has "repeatedly held that a state court's interpretation of state law,

10   including one announced on direct appeal of the challenged conviction, binds a federal court

11   sitting in habeas corpus."); see also Delphin v. California, No. 2:15-cv-1697-KJM-EFB P, 2017

12   WL 6344439, at *10-12 (E.D. Cal. Dec. 12, 2017); Medina v. Barnes, No. EDCV 12-1192 SVW

13   (JPR), 2014 WL 3557346, at *14 (C.D. Cal. July 17, 2014).  This Court recommends denying

14   petitioner's fourth claim because it is not cognizable on federal habeas review.

15    Even if the claim is cognizable, petitioner has not shown that the jury instruction was

16   constitutionally inadequate.  An irrelevant or incorrect jury instruction is grounds for habeas relief

17   only if "'the ailing instruction by itself so infected the entire trial that the resulting conviction

18   violates due process.'"  Estelle, 502 U.S. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147

19   (1973)); see also Gilmore v. Taylor, 508 U.S. 333, 342 (1993).  To demonstrate a constitutional

20   error, "the defendant must show both that the instruction was ambiguous and that there was 'a

21   reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its

22   burden of proving every element of the crime beyond a reasonable doubt."  Waddington v.

23   Sarausad, 555 U.S. 179, 190-91 (2009).  Courts should analyze the ailing instruction in the

24   context of the entire trial record.  Estelle, 502 U.S. at 72.  The Supreme Court has cautioned that

25   there are few infractions that violate fundamental fairness.  Id. at 72-73; see, e.g., Sarausad, 555

26   U.S. at 191-92; Middleton v. McNeil, 541 U.S. 433, 437 (2004) (per curiam) ("Nonetheless, not

27   every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due

28   process violation"); Jones v. United States, 527 U.S. 373, 390-92 (1999); Gilmore, 508 U.S. at

344.  Even if there was a constitutional violation, to obtain habeas relief, petitioner must also show that the error "had a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Brown v. Davenport, 142 S. Ct. 1510, 1517 (2022).  The state court assumed that the prosecutor was required to prove that defendant specifically intended that Ortega's murder be carried out by lying in wait and properly instructed the jury on this issue with CALCRIM Nos. 401, 702, and 728.  Jurors are presumed to follow the court's instructions.  Weeks v. Angelone, 528 U.S. 225, 234 (2000).  The state court's decision was not contrary to, or an unreasonable application of, clearly established federal law, or that such a finding was based on an unreasonable application of the facts.  Therefore, this Court recommends denying habeas relief on this claim as well.

E.  Claim Five: Uncharged Conspiracy Instruction (CALCRIM No. 416)

Petitioner contends that the jury was provided an erroneous instruction because uncharged conspiracy theory of liability is not a valid theory of accomplice liability.  (ECF No. 23 at 6, 35-41.)  In response, respondent argues this claim is not cognizable on habeas review.  (ECF No. 35.)

In the last well-reasoned state court opinion, the court considered and denied the claim on the merits.

> Fong-Jeffries claims, and both codefendants join her in claiming, that uncharged conspiracy is not a valid theory of accomplice liability. They claim that the trial court erred in instructing the jury that they could be found guilty on a conspiracy theory of accomplice liability. The California Supreme Court has rejected this argument, and, accordingly, we conclude that this contention is without merit.
>
> We note that, due to the defendants' failure to object to the instruction in the trial court, they have forfeited their contention unless the alleged error violates a substantial right. (*Battle*, *supra*, 198 Cal.App.4th at p. 64.) Nevertheless, because they claim, in effect, that the alleged error violated their substantial rights, we consider the issue. (*Ramos*, *supra*, 163 Cal.App.4th at p. 1087.)
>
> Without delving into the intricacies of the defendants' contentions, we simply observe that our high court has rejected the identical claim. In *People v. Hajek and Vo* (2014) 58 Cal.4th 1144 (*Hajek and Vo*), disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216, the defendants challenged the use of uncharged conspiracy as a theory of derivative liability where the defendants were not charged with the substantive offense of conspiracy. (*Hajek and Vo*, at p. 1200.) Our high court rejected the substance of the defendants' claim as meritless. (*Ibid.*) The court noted that

conspiracy principles are often, and for a variety of reasons, properly used in cases where the substantive crime of conspiracy is not charged. (*Ibid.*) The court further stated: "Conspiracy can itself be the basis of derivative liability quite apart from aiding and abetting principles. 'It is long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator. [Citations.] "Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory [citations]." [Citation.]' [Citation.] Contrary to Hajek's assertion, use of an uncharged conspiracy does not violate state law, even though the statutory definition of 'principals' set forth in section 31 does not include conspirators." (*Id.* at pp. 1200-1201.)

Thus, based on *Hajek and Vo*, we reject defendants' claim that the trial court erred in instructing the jury on an uncharged conspiracy theory of accomplice liability. We also reject, as we must (see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), their invitation to abrogate the case law holding that the use of uncharged conspiracy as a theory of accomplice liability is proper.

Additionally, because defendants' contentions in this regard are without merit, their claim that this alleged error violated their federal constitutional rights is likewise without merit.

Haven, 2019 WL 4051881, at *26-27.

Here, petitioner's attempt to rehash this same argument on habeas review does not succeed. Whether an uncharged conspiracy can be a valid theory of accomplice liability, particularly when the jury did not find that petitioner or his co-defendants were the shooter, is a matter of state law. On direct appeal, the state court rejected his claim that the trial court erred in instructing the jury on an uncharged conspiracy theory of accomplice liability. This Court must defer to the state court's interpretation of state law. Bradshaw, 546 U.S. at 76. Furthermore, petitioner has not stated a constitutional violation entitling him to habeas relief. The challenged instruction was not erroneous or irrelevant to the issues at trial, and petitioner has not presented any meritorious argument as to how a correct instruction could have infected the entire trial to render his conviction a violation of due process. See Estelle, 502 U.S. at 72. The state court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court authority. Habeas relief is not warranted.

////

1    F. Claim Six: Ineffective Assistance of Counsel

2         Petitioner claims that his counsel provided ineffective assistance of counsel due to the

3    "failure to turn over complete discovery, failure to fully read, and investigate discovery evidence,

4    failure to hire experts to test and present factual findings from evidence to mitigate the allegations

5    left the petitioner with an inadequate trial defense."  (ECF No. 34-32 at 14.)  Specifically, he

6    points out the following cumulative errors:  (1) failure to present evidence that the prosecutor's

7    theory that petitioner's jealously motivated premeditated murder was based on speculation and

8    falsehoods; (2) failure to present evidence that the theory of aiding and abetting was falsely based

9    on Robert Haven's statement; (3) error in withdrawing the motion for separate trials; (4) failure

10   present evidence that Stephanie Anton's testimony was based on misstatements and falsehoods;

11   (5) failure to present evidence regarding phone use; (6) failure to present evidence that Cheryl

12   Cook's statements were false; (7) failure to present evidence that Dustin Cook's statements were

13   false; (8) failure to present ammunition evidence; (9) failure to present expert to opine that Haven

14   was driving and texting at the time of the murder; (10) failure to present evidence that petitioner

15   did not give murder weapon to Bianca Villanueva; (11) failure to hire experts to test DNA and

16   latent evidence which was exculpatory and would have provided an alternative story to exonerate

17   petitioner; and (12) failure to present evidence to support co-defendant Fong-Jeffries's statement

18   that they had installed security cameras.  (ECF No. 23 at 6, 43-112.)  In response, respondent

19   argues that the state habeas court's rejection of these claims was not objectively unreasonable.

20   (ECF No. 35.)

21        Petitioner raised an ineffective assistance of counsel claim in his state habeas petition,

22   which the state court rejected on the merits.  (ECF No. 34-32.)

23            To show constitutionally inadequate assistance of counsel, a
     defendant must show that counsel's representation fell below an
24       objective standard and that counsel's failure was prejudicial to the
     defendant. (In re Alvernaz (1992) 2 Cal.4th 924, 937.) It is not a
25       court's duty to second-guess trial counsel and great deference is
     given to trial counsel's tactical decisions. (In re Avena (1996) 12
26       Cal.4th 694, 722.) Actual prejudice must be shown, meaning that
     there is a reasonable probability that, but for the attorney's error(s),
27       the result would have been different. (Strickland v. Washington
     (1984) 466 U.S. 668, 694.)
28

40

Petitioner claims that trial counsel was ineffective for failing to share discovery with Petitioner, failing to investigate facts relating to that discovery, and failing to hire expert witnesses. The petition primarily relies on text messages sent between Petitioner, Haven, and various others, which Petitioner claims would have discredited the prosecutor's theory that Petitioner had a motive to kill Ortega. However, Petitioner has not shown that the text messages would have been admissible at trial. In particular, since Petitioner did not testify at trial, any of the text messages allegedly written by him are inadmissible hearsay. (U Evid. Code, § 1200(b).)

Other text messages allegedly written by Haven might have been admissible. However, none of them support Petitioner's claim that he was not at the scene of the murder. At most, they contradict some of Haven's trial testimony. It is clear that the jury disbelieved parts of Haven's testimony, particularly the self-serving parts, since Haven was convicted of first-degree murder with a special circumstance. Therefore, Petitioner has not shown that impeaching Haven on some facts, such as his description of the alleged tampering with his truck, would have had any effect on the outcome of the trial.

Similarly, it is unclear how the text messages relating to Cook would have been used to impeach him. The only texts allegedly from Cook (as opposed to texts from others about Cook) were from March 30, after the murder had occurred. In addition, texts relating to Stephanie Anton do not disprove her testimony that she saw Petitioner with a firearm a few hours before the murder.

Petitioner also claims that trial counsel should have introduced a variety of other evidence, but failed to do so. Petitioner has not shown that any of the evidence likely would have had any effect on the outcome of the trial. Evidence that Petitioner and Amy Quillen were arguing over drug use and/or child custody issues does not preclude that Petitioner also had a motive to kill Ortega because he was in a relationship with Quillen. Likewise, evidence that Haven had a separate motive to kill Ortega, even if admissible, does not disprove that he also participated in the murder to help Petitioner, as offered by the prosecution. Nor was counsel negligent in failing to offer evidence of the arrest of Cheryl Cook, Ortega's mother. Even if she had purchased ammunition for Petitioner on March 29, this does not disprove that Petitioner had a (possibly concealed) motive to kill Ortega one month later. Next, Petitioner claims that counsel should have asked Desiree Dynes about her statement that she saw Haven and Cook leave Petitioner's apartment at midnight before the murder. Since Dynes testified that Petitioner stayed at his apartment the entire night, providing an alibi that was clearly rejected by the jury, any further testimony that she saw Cook and Haven leave would not likely have affected the outcome of the case. As to a letter written by Haven while in custody, even if admitted, it only would have shown that Haven was trying to relay to Cook that Petitioner was a snitch, not Haven.

Next, Petitioner claims that trial counsel should have moved to sever his trial from that of Haven so that Petitioner could have presented evidence relating to Haven's sex offender status, which was sanitized

41

1
2
3
4
5

in the joint trial. Even if counsel had filed a motion to sever, Petitioner has not shown that the motion likely would have been granted or that it would have affected the trial. First, Petitioner has not shown that he was clearly prejudiced by a joint trial. (See Williams v. Superior Court (1984) 36 Cal.3d 441,447 [clear prejudice required to sever defendants whose joinder was statutorily authorized].) In addition, as discussed above, Haven's additional motive does not disprove the prosecutor's theory that Petitioner also had a motive to kill Ortega.

6
7
8
9
10
11
12
13

Next, Petitioner claims that trial counsel failed to clarify that the actual bullets that killed Ortega were .38 specials rather than the .357 magnum bullets that were found with the firearm. He claims that Haven used .38 ammunition and possessed .38 ammunition at the time of his arrest, but that this information was "suppressed." Petitioner does not identify how the evidence was "suppressed," since Haven's motion pursuant to Penal Code section 1538.5 was denied. Even if counsel had moved to sever Petitioner's trial from that of Haven so that he could introduce the evidence, the claim does not refer to any attachment of Haven's arrest report, nor is the report listed as an exhibit. Moreover, even if the evidence showed that Haven possessed ammunition of the same caliber as the bullet that killed Ortega, this would not have shown that Petitioner was not guilty of murder on an aiding and abetting or conspiracy theory.

14
15
16

Lastly, Petitioner claims that trial counsel was ineffective for failing to test the gun for DNA. However, he has failed to show what DNA testing would have revealed. Although Petitioner has an order for post-trial DNA testing, the testing has not been completed. Therefore, he has not shown that counsel's omission was prejudicial.

17    (ECF No. 34-32 at 2-4.)

18        To state an ineffective assistance of counsel claim, a defendant must show that (1) his

19    counsel's performance was deficient, falling below an objective standard of reasonableness, and

20    (2) his counsel's deficient performance prejudiced the defense. Strickland v. Washington, 466

21    U.S. 668, 687-88 (1984). For the deficiency prong, "a court must indulge a strong presumption

22    that counsel's conduct falls within the wide range of reasonable professional assistance; that is,

23    the defendant must overcome the presumption that, under the circumstances, the challenged

24    action 'might be considered sound trial strategy.'" Id. at 689 (citation omitted). For the prejudice

25    prong, the defendant "must show that there is a reasonable probability that, but for counsel's

26    unprofessional errors, the result of the proceeding would have been different. A reasonable

27    probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

28        "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and

42

1   when the two apply in tandem, review is 'doubly' so." <u>Richter</u>, 562 U.S. at 105 (internal citations

2   omitted); <u>see also</u> <u>Landrigan</u>, 550 U.S. at 473.  When § 2254(d) applies, the "question is whether

3   there is any reasonable argument that counsel satisfied <u>Strickland's</u> deferential standard."

4   <u>Richter</u>, 562 U.S. at 105.  To the extent petitioner tries to present new evidence to support his

5   ineffective assistance of counsel claim, "review under § 2254(d)(1) is limited to the record that

6   was before the state court that adjudicated the claim on the merits." <u>Cullen v. Pinholster</u>, 563

7   U.S. 170, 181 (2011).

8                   1.   Failure to Present Evidence Claims

9          Petitioner asserts that his defense counsel was ineffective for failing to present a variety of

10  evidence.  (ECF No. 23.)  But "[t]rial management is the lawyer's province," and this includes

11  deciding "'what arguments to pursue, what evidentiary objections to raise, and what agreements

12  to conclude regarding the admission of evidence.'" <u>McCoy v. Louisiana</u>, 138 S. Ct. 1500, 1508

13  (2018) (citation omitted).  Other decisions are reserved for the client, including "whether to plead

14  guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." <u>Id.</u>  This

15  Court addresses each one of petitioner's failure to present evidence claims below.

16         First, petitioner claims that his counsel should have presented evidence including text

17  messages and child custody documents to show that petitioner was upset with Quillen's drug use

18  and child custody matters, not her sexual affair with Ortega, to rebut the prosecutor's theory that

19  jealously motivated the murder.  (ECF No. 23 at 49-60.)  The state court disagreed, concluding

20  that "[e]vidence that Petitioner and Amy Quillen were arguing over drug use and/or child custody

21  issues does not preclude that Petitioner also had a motive to kill Ortega because he was in a

22  relationship with Quillen.  Likewise, evidence that Haven had a separate motive to kill Ortega,

23  even if admissible, does not disprove that he also participated in the murder to help Petitioner, as

24  offered by the prosecution." (ECF No. 34-32 at 3; <u>id.</u> at 3 (finding that petitioner's claim also

25  fails because he has not shown that the text messages would have been admissible at trial).)  This

26  Court concludes that the state court's determination was not unreasonable.  Co-defendant's

27  counsel explored some of this evidence during Quillen's cross-examination, ECF No. 34-11 at

28  218-22, and petitioner's counsel could have made the tactical decision not to repeat this line of

1    inquiry.  Petitioner's counsel, Lisa Franco, also addressed the issue of motive in her closing

2    argument.  (ECF No. 34-18 at 129 ("So even common sense would tell you, why would Mr.

3    Jeffries want to kill someone who slept with his ex when he had his new wife who was his

4    family?  It just doesn't make sense."))  Based on this Court's review of the trial record, the state

5    court could have reasonably rejected petitioner's ineffective assistance of counsel claim.

6         Next, petitioner argues that his counsel was ineffective for not impeaching Haven's

7    testimony that on March 19, 2012, petitioner talked to him about his intent to kill Ortega.  (ECF

8    No. 23 at 60-62.)  The state court concluded that "[i]t is clear that the jury disbelieved parts of

9    Haven's testimony, particularly the self-serving parts," and the impeachment evidence would not

10   have changed the trial outcome.  (ECF No. 34-32 at 3.)  After reviewing the record, this Court

11   concludes that the state court's decision was not objectively unreasonable.  The state court could

12   have reasonably decided that petitioner's counsel was not deficient because she cross examined

13   Haven about events on March 19.  (ECF No. 34-16 at 142-48.)  Even if this Court assumes she

14   was deficient for not cross-examining Haven in the exact manner petitioner now raises, there is

15   no prejudice when counsel omits immaterial impeachment evidence.  See, e.g., Lapena v. Grigas,

16   736 F. App'x 651, 655 (9th Cir. 2018); Dobrovolny v. Terhune, 197 F. App'x 716, 717 (9th Cir.

17   2006).  Counsel's performance was within the wide latitude Strickland affords to trial counsel in

18   choosing a trial strategy and tactics.  Strickland, 466 U.S. at 689 ("There are countless ways to

19   provide effective assistance in any given case. Even the best criminal defense attorneys would not

20   defend a particular client in the same way."))  Petitioner is not entitled to habeas relief on this

21   issue.

22        In his fourth argument, petitioner claims that Anton confused events on March 18, 2012,

23   with those from March 27, 2012, and his counsel failed to cross examine the witness about this

24   error.  He asserts that this discrepancy would cast doubt on whether Anton saw petitioner with a

25   gun on the night of the murder.  (ECF No. 23 at 64-66.)  The state court disagreed, concluding

26   that "texts relating to Stephanie Anton do not disprove her testimony that she saw Petitioner with

27   a firearm a few hours before the murder."  (ECF No. 34-32 at 3.)  After reviewing the record, this

28   Court finds that the state court's conclusion was not unreasonable.  Anton testified that she went

1    to the apartments daily, so it is possible that she was there on both March 18 and 27.  (ECF No.

2    34-12 at 214.)  And despite petitioner's claim to the contrary, his counsel did question Anton

3    about how certain she was that her recollection concerned events on March 27.  (ECF No. 34-12

4    at 214.)

5            Petitioner also claims that his counsel provided ineffective assistance of counsel when she

6    failed to impeach Haven's testimony regarding use of 534 phone number on the night of the

7    murder.  (ECF No. 23 at 66-69.)  Petitioner's theory was that Haven had both the 534 and 968

8    phones when the murder occurred.  (Id.)  The state court rejected petitioner's claim, concluding

9    that although "text messages allegedly written by Haven might have been admissible," "none of

10   them support Petitioner's claim that he was not at the scene of the murder.  At most, they

11   contradict some of Haven's trial testimony."  (ECF No. 34-32 at 3.)  The state court's denial of

12   petitioner's ineffective assistance of counsel claim regarding phone usage was not unreasonable.

13   On cross-examination, defense counsel questioned Haven about how common it was for people to

14   use each other's phones at the apartment complex.  (ECF No. 34-16 at 147-48; id. at 152 (Haven

15   testified that his number started with 968.))  There was also testimony that petitioner did not let

16   anyone use his 534 phone number.  (ECF No. 34-14 at 160-61.)  Based on the record, the state

17   court's conclusion was not contrary to or an unreasonable application of clearly established

18   federal law.

19           In his sixth argument, petitioner claims that counsel was ineffective for not using text

20   messages to impeach Cheryl Cook's recollection that petitioner and Haven were at her home

21   around 5pm on March 27 and returned again around 8 or 9pm before leaving with Ortega.  (ECF

22   No. 23 at 69-78.)  He also argues that counsel should have introduced text messages showing no

23   animosity between Ortega and petitioner.  (Id.)  The state court denied this argument, generally

24   concluding that "[p]etitioner has not shown that any of the evidence likely would have had any

25   effect on the outcome of the trial."  (ECF No. 34-32 at 3.)  The state court's determination was

26   reasonable because the evidence cited by petitioner does not show that he was not at Cheryl

27   Cook's apartment that evening.  Before her son's death, Cheryl Cook knew petitioner for about a

28   year and Haven for about three months.  (ECF No. 34-12 at 75-76.)  When Ortega did not return

1   home the evening of March 27, Cheryl Cook texted petitioner and Haven, and petitioner lied,

2   texting that her son took a car downtown and would be home later.  (Id. at 79-85.)  Regarding

3   animosity, Cheryl Cook testified that in the days leading up to his death, Ortega seemed scared of

4   petitioner even though petitioner told Ortega he wanted to be friends again.  (Id. at 85-86, 106-

5   07.)  Based on the record, fairminded jurists could disagree with the state court's determination

6   and habeas relief is not warranted on this claim.

7        Next, petitioner takes issues with counsel's failure to impeach Dustin Cook's alibi that he

8   was passed out from muscle relaxers the night of the murder.  (ECF No. 23 at 78-82.)  He claims

9   that text messages also would have cast doubt on Dustin's credibility because Dustin and Haven

10  were often seen with guns, and a letter from Haven mentions not leading police to Dustin.  (Id.)

11  The state court rejected petitioner's argument concluding that the text messages postdated the

12  murder and "[a]s to the letter written by Haven while in custody, even if admitted, it only would

13  have shown that Haven was trying to relay to Cook that Petitioner was a snitch, not Haven."

14  (ECF No. 34-32 at 3.)  After reviewing the evidence, this Court concludes that the state court's

15  determination was not objectively unreasonable.  Co-defendant's counsel cross-examined the

16  witness about his alibi, as did petitioner's counsel albeit briefly.  (ECF No. 34-14 at 70-74, 88;

17  see also id. at 239 (Theodore McQueen testified that Dustin wasn't feeling good and went home

18  with his girlfriend the night of the murder.))  The texts messages now cited by petitioner do not

19  contradict Dustin's alibi.  The state court could have reasonably concluded that failing to impeach

20  the witness with the suggested evidence was not prejudicial.  Furthermore, the fact that Dustin

21  and Haven may have discussed guns on a date before or after the murder does rebut Dustin's

22  credibility that he was asleep the night Ortega was killed.[3]

23        In his eighth argument, petitioner argues that counsel performed inadequately by failing to

24  _____

25  [3] Under this section of the petition, petitioner also argues that trial counsel was ineffective for not
    asking Desiree Dynes if she had seen anyone leave on the night of March 27, 2012.  (ECF No. 23

26  at 80.)  The state court concluded that "[s]ince Dynes testified that she Petitioner stayed at his
    apartment the entire night, providing an alibi that was clearly rejected by the jury, any further

27  testimony that she saw Cook and Haven leave would not likely have affected the outcome of the
    case."  (ECF No. 34-32 at 3.)  This determination was objectively reasonable; if petitioner was

28  home, Dynes could have seen other persons leaving the apartment.

1   present evidence to rebut the prosecutor's evidence that Ortega was killed by a .357 caliber gun.

2   (ECF No. 23 at 82-84.)  Specifically, he wanted his counsel to undermine the prosecutor's

3   evidence that the .357 caliber ammunition recovered from the storage locker matched the

4   ammunition that killed Ortega with (1) another witness's testimony that Haven handed her a full

5   box of ammunition on the night of the murder, not a box missing some bullets, and (2) Saggs's

6   ballistics report noted Ortega was killed by a .38 caliber bullet.  (Id.)  The state court rejected

7   petitioner's ineffective assistance of counsel claim regarding ammunition evidence, concluding

8   "even if the evidence showed that Haven possessed ammunition of the same caliber as the bullet

9   that killed Ortega, this would not have shown that Petitioner was not guilty of murder on an

10  aiding and abetting or conspiracy theory."  (ECF No. 34-32 at 4.)  Based on the record, the state

11  court's determination was not unreasonable; as petitioner pointed out in his petition, the jury did

12  not convict Haven or petitioner of being the actual shooter.  Furthermore, petitioner misrepresents

13  the evidence.  The ballistics report noted the bullet jacket is "indicative of the type commonly

14  associated with .357 Magnum or .38 Special caliber ammunition" and the potential matching

15  firearms include a Taurus .357 Magnum, among others.  (ECF No. 34-32 at 436-37.)  The

16  prosecutor's expert, Saggs, testified that "although you have a .38 caliber [weapon], there are

17  many different kinds of .38 caliber ammunition . . . including .38 special, .357, .38 Smith &

18  Wesson…."  (ECF No. 34-12 at 175-76; see also id. at 178 (testifying that a Taurus .357 could

19  fire .38 Special or .357 Magnum bullets).)  After test firing the recovered weapon and bullets,

20  Saggs concluded that "[a]ll discernable class characteristics are similar and sufficient individual

21  agreement was observed to conclude that the jacket was discharged from the revolver."  (ECF No.

22  34-32 at 439.)  Detective McCue testified that he found a Taurus .357 and .357 ammunition

23  during a search of a storage locker, and Theodore McQueen testified that he saw Haven with a

24  pistol the night of the murder.  ((ECF No. 34-12 at 29-30, 39-40; ECF No. 34-14 at 235.)  The

25  state court could have reasonably concluded that counsel's omission of the suggested

26  impeachment evidence was neither deficient nor prejudicial.

27          Petitioner argues that trial counsel rendered ineffective assistance of counsel by failing to

28  establish that the cell phone records prove that Haven, not petitioner, gave Bianca Villanueva the

1    gun on March 28, 2012.  (ECF No. 23 at 85-89.)  After reviewing the record, this Court concludes

2    that the state court could have reasonably determined that counsel's performance was neither

3    deficient nor prejudicial.  At trial, Villanueva testified that petitioner asked Haven to get the gun,

4    and Haven returned with the gun wrapped in a red shirt.  Then Haven handed the gun to petitioner

5    who handed it to Villanueva.  (ECF No. 34-13 at 178-82.)  During trial, there was evidence that

6    petitioner coordinated with Haven and Villanueva to transfer and store the gun.  (Id. at 91-93.)

7    During closing arguments, petitioner's counsel summarized that, at most, Villanueva's testimony

8    established that petitioner knew Villanueva and was helping a friend get rid of a gun.  (ECF No.

9    34-18 at 155.)

10         Lastly, petitioner claims that counsel was ineffective for failing to rebut the prosecutor's

11   theory that Haven's text message about tightening up security meant Ortega had been killed,

12   rather than an innocent reference to security cameras.  (ECF No. 23 at 91-92.)  Like the other

13   claims, the state court could have reasonably rejected this claim too.  Defense counsel made a

14   tactical decision to frame Haven's statement as support for the theory that Haven committed the

15   murder, not petitioner.  (ECF No. 34-18 at 151 ("Maybe they think he's talking about cameras.

16   But we know Mr. Haven was talking about Tony being killed. If he was talking about a camera,

17   he would have said, I fixed the camera, no worries, we'll be able to see everything."))  The fact

18   that this tactical decision did not produce the desired outcome is insufficient to find the state

19   court's determination objectively unreasonable.

20         In summary, the state court's rejection of petitioner's ineffective assistance of counsel

21   claim was not contrary to, or an unreasonable application of, clearly established federal law.  The

22   state court reasonably concluded that petitioner has not demonstrated that defense counsel's

23   failure to present the evidence detailed above constitutes deficient performance or that this

24   evidence could have reasonably resulted in a different outcome.  See Woodford, 384 F.3d at 641-

25   42.  Accordingly, petitioner is not entitled to habeas relief on these claims.

26              2.  Withdrawing Motion to Sever Trials

27         Next, petitioner claims that trial counsel provided ineffective assistance of counsel when

28   she withdrew the motion to sever the trials, preventing her from offering evidence of Haven's

past sex offenses and motive to kill Ortega.  (ECF No. 23 at 62-64 (claiming that Ortega disliked Haven because Haven was a sex offender and sexually intimate with a minor).)

To show prejudice under Strickland for trial counsel's failure to file a motion, petitioner must show that "(1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him."  Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999) (citing Kimmelman v. Morrison, 477 U.S. 365, 373-75 (1986)).  Here, petitioner's counsel filed a motion to sever his case from co-defendant Robert Haven's case based on conflicting defenses.  (ECF No. 34-1 at 127.)  His counsel later withdrew the motion.  (ECF No. 34-10 at 225-28.)  The state court concluded that petitioner has not shown that the motion would have been granted or would have impacted the trial.  (ECF No. 34-32 at 3-4 (stating that petitioner has not shown prejudice from the joint trial and petitioner's motive to kill Ortega was not disproved by Haven's additional motive to kill Ortega).)  The state court's determination was reasonable; this Court agrees that petitioner has failed to show that the trial court would have granted this motion as meritorious, or that, had the trial court granted the motion, the jury's verdict would have been more favorable to him.  Wilson, 185 F.3d at 990.  Some of the evidence petitioner now claims would have impacted the outcome was introduced at trial. (ECF No. 23 at 62; ECF No. 34-15 at 207-09 (Haven testifying that Ortega showed animosity towards him.)  This Court finds that the state court's rejection of this claim was not objectively unreasonable and recommends denying habeas relief.

### 3.   Failing to Present Defense Experts

Lastly, petitioner faults his counsel for not engaging experts (1) to opine that Haven's text messages are consistent with texting and driving at the time of the murder to rebut Haven's testimony that petitioner drove the car to the murder location and (2) to test the gun for Dustin Cook's DNA evidence.  (ECF No. 23 at 84-85, 89-91.)  On habeas review, the Supreme Court has "explained that strategic decisions—including whether to hire an expert—are entitled to a 'strong presumption' of reasonableness."  Dunn v. Reeves, 141 S. Ct. 2405, 2410 (2021) (per curiam).

As to his texting and driving theory, the state court generally concluded that Haven's text

49

1   messages "at most contradict some of Haven's trial testimony." (ECF No. 34-32 at 3.)  This

2   determination was not unreasonable; none of the text messages prove that petitioner was not

3   driving the car.  And Haven testified that petitioner was driving the car that evening.  (ECF No.

4   34-15 at 243-44, 249.)  Nor has petitioner identified an expert that would have supported his

5   theory based on Haven's misspelled text messages.  Without any evidence that such an expert

6   witness actually exists or would provide helpful testimony, petitioner has failed to prove the

7   defense counsel was ineffective.  See Dows v. Wood, 211 F.3d 480, 486 (9th Cir. 2000).

8   Conclusory allegations that are not supported by statements of fact do not warrant habeas relief.

9   See Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995); James v. Borg, 24 F.3d 20, 26 (9th Cir.

10  1994).  Petitioner has not rebutted the presumption that defense counsel's decision not to hire an

11  expert on this issue was reasonable trial strategy.  Strickland, 466 U.S. at 689.

12          Regarding the failure to test DNA evidence, the state court concluded that "he has failed

13  to show what DNA testing would have revealed.  Although Petitioner has an order for post-trial

14  DNA testing, the testing has not been completed.  Therefore, he has not shown that counsel's

15  omission was prejudicial." (ECF No. 34-32 at 4.)  After reviewing the record, this Court

16  determines that the state court's finding was not objectively unreasonable.  Defense counsel had

17  limited resources, and petitioner's theory that the DNA evidence would have exonerated him was

18  speculative at best.  Smith v. Stewart, 140 F.3d 1263, 1274 (9th Cir. 1998); Smith v. Wasden, 747

19  F. App'x 471, 475 (9th Cir. 2018); see also Hernandez v. Smith, 100 F. App'x 615, 617 (9th Cir.

20  2004) (finding that trial court's decision not to introduce expert testimony regarding inconclusive

21  fingerprints from crime scene did not constitute ineffective assistance of counsel).  Based on this

22  Court's review of the record, instead of offering his own defense expert witness, defense counsel

23  made a tactical decision to stress that gun had no owner, could have been passed around, and had

24  "no DNA, no prints" that belong to petitioner.  (ECF No. 34-18 at 131; ECF No. 34-13 at 296

25  (testimony that none of the fingerprints from the gun matched petitioner, Haven, or Fong-

26  Jeffries)).  In closing argument, defense counsel argued that there was only one shooter, and that

27  shooter was Haven.  (ECF No. 34-18 at 135.)  This Court concludes that the state court's rejection

28  of petitioner's claim was not objectively unreasonable and recommends denying habeas relief.

1    G. Claim Seven: Newly Discovered Evidence

2          Lastly, petitioner claims to present new evidence in the form of a 2015 Declaration of

3    David Thompson, which establishes that Dustin Cook shot Ortega with Robert Haven.  (ECF No.

4    23 at 6, 44, 113-24.; see also ECF No. 34-32 at 542-45 (Declaration of David Thompson).)  In

5    response, respondent argues that this new evidence claim under state law is not cognizable under

6    federal habeas review.  (ECF No. 35.)

7          This claim was raised for the first time in a state habeas petition, and the state court denied

8    the claim.

9          A petitioner seeking relief by way of habeas corpus has the burden
      of stating a prima facie case entitling him to relief. (In re Bower
10    (1985) 38 Cal.3d 865, 872.) A petition for writ of habeas corpus
      should include as exhibits all reasonably available documentary
11    evidence or affidavits supporting the claim. (People v. Duvall (1995)
      9 Cal.4th 464, 474.) Newly discovered evidence may be the basis for
12    habeas relief if it "is credible, material, presented without substantial
      delay, and of such decisive force and value that it would have more
13    likely than not changed the outcome at trial." (Pen. Code,§
      1473(b)(3)(A).) It must also be admissible and "not merely
14    cumulative, corroborative, collateral, or impeaching." (Pen. Code,§
      1473(b)(3)(B).)
15
      Petitioner claims that he has obtained newly discovered evidence: the
16    declaration of David Thompson. In the declaration, Thompson states
      that he was housed in the Sacramento County Main Jail in late 2013
17    and became friends with Petitioner's co-defendant Robert Haven:
      (Exhibit A.) Haven told Thompson that he (Haven) was blaming his
18    co-defendants because they had failed to bail him out. Haven said
      that he, "Dustin," and "his girl" planned to beat up the victim Tony
19    (Anthony Ortega), but then decided to kill him instead. Tony directed
      them to a dark road where "they shot him." Haven made it clear that
20    Dustin shot Tony. (Id.)

21    First, Petitioner has not shown that the evidence was presented
      without substantial delay. The declaration is dated in 2015,
22    approximately four years before the petition was filed. Although
      Petitioner states that he could not have obtained the evidence during
23    trial, he does not explain the delay in obtaining the material. Next, he
      states that he spent three years obtaining corroborating evidence, but
24    does not specify how the evidence "corroborates" Thompson's
      statement. While some of the evidence could possibly impeach
25    Haven's trial testimony, it does not support the theory that Dustin
      Cook shot the victim or that Petitioner did not aid and abet in or
26    conspire to commit the murder, as further described below.

27    Second, Petitioner has not shown that the evidence is admissible.
      Any statement that Haven made to Thompson likely would have
28    been hearsay, since Petitioner is offering it for the truth of the

51

statement, i.e., that Cook shot Ortega and that Petitioner was not there. Petitioner has not offered any exception to the hearsay rule that would allow the statement to be admitted. Although it might be admissible to impeach Haven and/or Cook under Evidence Code section 1235, admissibility for impeachment only does not qualify as newly discovered evidence.

Third, Petitioner insists that the evidence is not merely cumulative because it shows who was at the scene of the murder and that Dustin Cook was the actual shooter supporting Petitioner's third-party culpability claim. However, Petitioner already presented evidence at trial that he was elsewhere at the time of the murder, i.e., at home. Therefore, to the extent that Thompson's statement shows that Petitioner was not at the scene of the murder, it was cumulative of Petitioner's alibi witnesses. Therefore, Petitioner has not shown that Thompson's declaration constitutes newly discovered evidence on which habeas relief can be granted.

(ECF No. 34-32 at 1-2.)  The California Court of Appeals and California Supreme Court summarily rejected this claim.  (ECF Nos. 34-33 & 34-34.)

Petitioner argues that the state court erred in concluding that the declaration does not constitute newly discovered evidence under California Penal Code § 1473(b)(3).  A federal habeas court is limited to reviewing whether a conviction violated federal law.  Petitioner's claim is based on California law.  Any errors of state law made by the state court do not warrant federal habeas relief.  See Estelle, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")

In the traverse, petitioner asserts that the state court made a constitutional error by denying his claim without full review of the underlying file.  (ECF No. 36 at 26-27.)  Petitioner is mistaken.  The state court never stated that it did not conduct an entire review of the underlying file before reaching its decision.  Instead, it noted that

In light of this Court's orders of March 17, 2020, March 19, 2020 and April 16, 2020, the Court was closed for non-essential services from March 20, 2020, until further notice, in order to follow necessary safety precautions required during the Covid-19 worldwide pandemic. Those orders suspended and extended all other matters. This closure has significantly impaired the Court's ability to obtain the underlying file in the instant matter and provide a full review of the issues in light of the underlying record of conviction.

(ECF No. 34-32 at 1.)  This Court reads this statement differently than petitioner.  The state court

52

1   acknowledged that it was significantly impaired from obtaining and reviewing the underlying file

2   during the March and April 2020 pandemic closures.  But the state court's order denying the state

3   habeas petition is dated June 23, 2020, several months later.  The state court's factually intensive

4   order also suggests that it reviewed the record before reaching its decision.

5          Petitioner cites a few cases to support his argument that the newly discovered evidence

6   establishes that "a constitutional violation occurred convicting an innocent person."  (ECF No. 23

7   at 117.)  But these cases are distinguishable; they all concern the actual innocence exception to a

8   procedurally defaulted claim.  See Schlup v. Delo, 513 U.S. 298, 327 (1995); House v. Bell, 547

9   U.S. 518 (2006); Murray v. Carrier, 477 U.S. 478 (1986).  Here, the state court did not conclude

10  that petitioner's claim was procedurally defaulted.  This actual innocence gateway exception,

11  therefore, does not apply.

12         To the extent petitioner is attempting to argue a freestanding actual innocence claim, that

13  argument also fails.  The Supreme Court has not yet resolved whether a prisoner is entitled to

14  habeas relief for a freestanding actual innocence claim.  McQuiggin v. Perkins, 569 U.S. 383, 392

15  (2013); Herrera v. Collins, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on

16  newly discovered evidence have never been held to state a ground for federal habeas relief absent

17  an independent constitutional violation occurring in the underlying state criminal proceeding.");

18  Gimenez v. Ochoa, 821 F.3d 1136, 1143-45 (9th Cir. 2016) ("The Supreme Court has never

19  recognized 'actual innocence' as a constitutional error that would provide grounds for relief

20  without an independent constitutional violation."); Jones v. Taylor, 763 F.3d 1242, 1246 (9th Cir.

21  2014) ("We have not resolved whether a freestanding actual innocence claim is cognizable in a

22  federal habeas corpus proceeding in the non-capital context, although we have assumed that such

23  a claim is viable.")  But assuming this claim does exist, "[t]he standard for establishing a

24  freestanding claim of actual innocence is extraordinarily high and the showing for a successful

25  claim would have to be truly persuasive."  Jones, 763 F.3d at 1246 (cleaned up) (citation

26  omitted); see Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997) (en banc).  Petitioner "must

27  go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably

28  innocent."  Carriger, 132 F.3d at 476.

1    Petitioner has not met this burden.  The declaration only undercuts the evidence presented

2    at trial and does not affirmatively prove petitioner's innocence.  Like in <u>Carriger</u>, petitioner does

3    not provide any new evidence bolstering his alibi, nor does he present any reliable physical

4    evidence that undermines the possibility of his guilt.  <u>Id.</u> at 477.  As noted above, the jury heard

5    and rejected petitioner's alibi that he was home when the murder occurred.  (ECF No. 34-32 at 3.)

6    Although the declaration purports to provide Haven's confession, this Court cannot completely

7    ignore the contradictions in Haven's accounts of that evening.  (ECF No. 34-15 at 128 (Haven

8    testifying that he saw petitioner kill Ortega); ECF No. 34-14 at 9-11, 86 (Dustin Cook testifying

9    that Haven said he shot Ortega); ECF No. 34-32 at 542-45 (Thompson's declaration that Haven

10    said he shot Ortega with Dustin Cook).)  As a result, the declaration falls short of affirmatively

11    proving that petitioner more likely than not is innocent.  <u>See</u> <u>Carriger</u>, 132 F.3d at 477; <u>Prescott v.</u>

12    <u>Santoro</u>, 53 F.3d 470, 483-84 (9th Cir. 2022).  Petitioner is not entitled to habeas relief on a

13    freestanding actual innocence claim.

14    VI.  <u>Conclusion</u>

15    Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

16    habeas corpus be denied.

17    These findings and recommendations are submitted to the United States District Judge

18    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

19    after being served with these findings and recommendations, any party may file written

20    objections with the court and serve a copy on all parties.  Such a document should be captioned

21    "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

22    he shall also address whether a certificate of appealability should issue and, if so, why, and as to

23    which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

24    applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

25    § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

26    service of the objections.  The parties are advised that failure to file objections within the

27    ////

28    ////

specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

F.2d 1153 (9th Cir. 1991).

Dated:  April 25, 2023

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

TAA/jeff2414.157

55